

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 2-07-095-CV

| | |
|---|---|
| STEPHANIE DUKES, INDIVIDUALLY, STEPHANIE DUKES, AS INDEPENDENT EXECUTOR OF THE ESTATE OF MYRON DUKES, DECEASED, STEPHANIE DUKES, AS INDEPENDENT EXECUTOR OF THE ESTATE OF CHRISTOPHER DUKES, DECEASED, STEPHANIE DUKES, AS INDEPENDENT EXECUTOR OF THE ESTATE OF LAUREN DUKES, DECEASED, LOTTIE JAQUESZIAN DUKES, INDIVIDUALLY, MYRON JAMAL DUKES, INDIVIDUALLY, BY HIS MOTHER AND NEXT FRIEND, GLENDA MAGHETT, ALEXANDRA DEADMON, INDIVIDUALLY, FRUENZE DEADMON, INDIVIDUALLY, ALEXANDRA DEADMON AND FRUENZE DEADMON, AS INDEPENDENT CO-EXECUTORS OF THE ESTATE OF JUANITRICE DEADMON, DECEASED, FRUENZE DEADMON, JR., INDIVIDUALLY, BY HIS PARENTS AND NEXT FRIENDS, ALEXANDRA DEADMON AND FRUENZE DEADMON, CAMERON DEADMON, INDIVIDUALLY, BY HIS PARENTS AND NEXT FRIENDS, ALEXANDRA DEADMON AND FRUENZE DEADMON, GEMMIA DEADMON, INDIVIDUALLY, BY HER PARENTS AND NEXT FRIENDS, ALEXANDRA DEADMON AND FRUENZE DEADMON | APPELLANTS |

V.

PHILIP JOHNSON/ALAN RITCHIE                                    APPELLEES
ARCHITECTS, P.C., PHILIP JOHNSON,
RITCHIE & FIORE ARCHITECTS, P.C.,
ALAN RITCHIE/DAVID FIORE ARCHITECTS,
P.C., PHILIP JOHNSON, ALAN RITCHIE,
DAVID FIORE, PETER JOHANTGEN,
PETER JOHANTGEN CONSULTING, INC.,
HUITT-ZOLLARS, INC., EMILE KELLER,
AND AUSTIN COMMERCIAL, INC.

------------

FROM THE 141ST DISTRICT COURT OF TARRANT COUNTY

------------

**OPINION**

------------

## I. Introduction

In eleven issues, Stephanie Dukes, Individually; Stephanie Dukes, as Independent Executor of the Estate of Myron Dukes, Deceased; Stephanie Dukes, as Independent Executor of the Estate of Christopher Dukes; Stephanie Dukes, as Independent Executor of the Estate of Lauren Dukes, Deceased; Lottie Jaqueszian Dukes, Individually; Myron Jamal Dukes, Individually, by his Mother and Next Friend, Glenda Maghett; Alexandra Deadmon, Individually; Fruenze Deadmon, Individually; Alexandra Deadmon and Fruenze Deadmon, as

2

Independent Co-Executors of the Estate of Juanitrice Deadmon, Deceased; Fruenze Deadmon, Jr., Individually, by his Parents and Next Friends, Alexandra Deadmon and Fruenze Deadmon; Cameron Deadmon, Individually, by his Parents and Next Friends, Alexandra Deadmon and Fruenze Deadmon; Gemmia Deadmon, Individually, by her Parents and Next Friends, Alexandra Deadmon and Fruenze Deadmon, (hereinafter "Dukes") appeals the trial court's granting of summary judgment to Philip Johnson/Alan Ritchie Architects, P.C., Philip Johnson, Ritchie & Fiore Architects, P.C., David G. Whitney and Alan Ritchie, Alan Ritchie/David Fiore Architects, P.C. and David Fiore (collectively "Johnson/Ritchie"); Huitt-Zollars, Inc. and Emile Keller (collectively "Huitt/Keller"); Peter Johantgen and Peter Johantgen Consulting, Inc. (collectively "Johantgen"); and Austin Commercial, Inc. (hereafter "Austin").

## II. Factual History

This case involves the tragic drowning deaths of Myron Dukes, Christopher Dukes, Lauren Dukes, and Juanitrice Deadmon on June 16, 2004 in the Fort Worth Water Gardens. No one knows exactly how Lauren and Juanitrice initially entered the Active Water Pool. Lauren was reportedly the first to enter the water, and Juanitrice reportedly tried to help her out and either fell in or jumped in the pool. Both Myron and Christopher Dukes drowned after entering the Active Water Pool in an effort to save the girls.

3

Since 1974, the Fort Worth Water Gardens, an outdoor urban park and water sculpture, have been an architectural favorite and a source of pride for the City of Fort Worth ("City"). The City has owned and controlled the Water Gardens since the 1970s. Prior to this accident, there had been no previous drowning deaths in the Water Gardens.

The Water Gardens were originally designed by architects Philip Johnson and John Burgee and were not intended for swimming. In the 1990s, the City determined that it would engage in a restoration and renovation of the Water Gardens in conjunction with the Fort Worth Convention Center Renovation Project ("Project"). The City contracted with Huitt/Keller from 1994-2000 to perform an architectural assessment of the Water Gardens. In 1999, the City also contracted with Johnson/Ritchie and Johantgen as consulting architects. In 2001 through 2002, the City contracted with Austin to act as a project manager for the Project, adjacent to the Water Gardens.

Shortly after the accident, Dukes filed suit against the City and a number of architectural firms and engineering firms, as well as individual architects, engineers, and contractors. Dukes asserted wrongful death, survival, and bystander claims against multiple defendants. Dukes settled with the City in 2005. The remaining Appellees are comprised of architectural firms,

engineering firms, and individual architects and engineers who have been involved over the years with the design or restoration of the Water Gardens.

## III. Procedural Background

All of the nonsettling defendants in the underlying case, including those involved in this appeal, filed motions for summary judgment. Each of the defendants asserted that they owed no duty to the Dukes. In addition, Johnson/Ritchie asserted that there was no proximate cause between their actions and the incident in question and that the Dukes's claims were barred by limitations. On April 10, 2007, the trial court granted summary judgment to all of the aforementioned parties without specifying the grounds therefor. This appeal followed.

## IV. Standard of Review

In a summary judgment case, the issue on appeal is whether the movant met the summary judgment burden by establishing that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c); *Sw. Elec. Power Co. v. Grant,* 73 S.W.3d 211, 215 (Tex. 2002); *City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678 (Tex. 1979). The burden of proof is on the movant, and all doubts about the existence of a genuine issue of material fact are resolved against the movant. *Sw. Elec. Power Co.,* 73 S.W.3d at 215.

5

When reviewing a summary judgment, we take as true all evidence favorable to the nonmovant, and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005). Evidence that favors the movant's position will not be considered unless it is uncontroverted. *Great Am. Reserve Ins. Co. v. San Antonio Plumbing Supply Co.*, 391 S.W.2d 41, 47 (Tex. 1965). But we must consider whether reasonable and fair-minded jurors could differ in their conclusions in light of all of the evidence presented. *See Wal-Mart Stores, Inc. v. Spates*, 186 S.W.3d 566, 568 (Tex. 2006); *City of Keller v. Wilson*, 168 S.W.3d 802, 822-24 (Tex. 2005).

The summary judgment will be affirmed only if the record establishes that the movant has conclusively proved all essential elements of the movant's cause of action or defense as a matter of law. *Clear Creek Basin*, 589 S.W.2d at 678.

A defendant who conclusively negates at least one essential element of a cause of action is entitled to summary judgment on that claim. *IHS Cedars Treatment Ctr. of Desoto, Tex., Inc. v. Mason*, 143 S.W.3d 794, 798 (Tex. 2004). Once the defendant produces sufficient evidence to establish the right to summary judgment, the burden shifts to the plaintiff to come forward with competent controverting evidence raising a genuine issue of material fact with

6

regard to the element challenged by the defendant. *Centeq Realty, Inc. v. Siegler*, 899 S.W.2d 195, 197 (Tex. 1995).

When a trial court's order granting summary judgment does not specify the ground or grounds relied on for its ruling, summary judgment will be affirmed on appeal if any of the theories presented to the trial court and preserved for appellate review are meritorious. *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 216 (Tex. 2003); *Star-Telegram, Inc. v. Doe*, 915 S.W.2d 471, 473 (Tex. 1995).

## V. Duty

The primary question in this case is whether Johnson/Ritchie, Johantgen, Huitt/Keller, and Austin owed a duty to the decedents.

### A. General Negligence Law

The common law doctrine of negligence consists of three elements: (1) a legal duty owed by one person to another; (2) a breach of that duty; and (3) damages proximately resulting from the breach. *Greater Houston Transp. Co. v. Phillips*, 801 S.W.2d 523, 525 (Tex. 1990). The threshold inquiry in a negligence case is duty. *Id.* The plaintiff must establish both the existence and violation of a duty owed to the plaintiff by the defendant to establish liability in tort. *Id.* Whether a duty exists is a question of law for the court to decide from the facts surrounding the occurrence in question. *Timberwalk*

7

*Apartments, Partners, Inc. v. Cain*, 972 S.W.2d 749, 756 (Tex. 1998); *Otis Eng'g Corp. v. Clark*, 668 S.W.2d 307, 312 (Tex. 1983); *Pichardo v. Big Diamond, Inc*., 215 S.W.3d 497, 500-01 (Tex. App.—Fort Worth 2007, no pet.).

**B. Premises Liability Law**

Premises liability is a special form of negligence. *W. Invs., Inc. v. Urena,* 162 S.W.3d 547, 550 (Tex. 2005). A premises defect cause of action exists if a person is injured as a result of a condition of the premises. *City of San Antonio v. Estrada,* 219 S.W.3d 28, 32 (Tex. App.—San Antonio 2006, no pet.). Duty is still a threshold inquiry in a premises liability case, and the duty owed to the claimant depends on the status of a claimant at the time that the incident giving rise to the lawsuit occurred. *Centeq Realty, Inc. v. Siegler*, 899 S.W.2d 195, 197 (Tex. 1995); *Urena,* 162 S.W.3d at 550. This status can be one of an invitee, licensee, or trespasser.[1] *Alamanza v. Navar,* 225 S.W.3d 14, 20 (Tex. App.—El Paso 2005, no pet.).

Whether a duty exists to keep the premises in a safe condition is a question of law for the court to decide based on the facts and circumstances. *Seaway Prods. Pipeline Co. v. Hanley*, 153 S.W.3d 643, 654 (Tex. App.—Fort

---

[1] It is undisputed that the four individuals, whose deaths were the genesis of this case, were invitees.

Worth 2004, no pet.). If no duty exists, then no legal liability for a premises liability claim can arise. *Strunk v. Belt Line Rd. Realty Co.,* 225 S.W.3d 91, 99 (Tex. App.—El Paso 2005, no pet.).

A defendant, who was the owner or occupier of the premises at the time of the injury, must have had control of the premises to be liable under premises liability. *Wal-Mart Stores, Inc. v. Alexander*, 868 S.W.2d 322, 324 (Tex. 1993). Therefore, a plaintiff must prove that the defendant had control over and responsibility for the premises before a duty can be imposed on the defendant. *See County of Cameron v. Brown*, 80 S.W.3d 549, 556 (Tex. 2002). The control that the defendant had over the premises must relate to the condition or activity that caused the injury. *See Clayton W. Williams, Jr., Inc. v. Olivo*, 952 S.W.2d 523, 527-28 (Tex. 1997).

Ordinarily a person who does not own the real property must assume control over and responsibility for the premises before there will be liability for a dangerous condition existing on the real property. *City of Denton v. Page,* 701 S.W.2d 831, 835 (Tex. 1986); *see, e.g., Alexander*, 868 S.W.2d at 324 (stating that a lessee is responsible for those areas adjacent to the demised premises which it actually controls). However, a private person who has created the dangerous condition or who has agreed to make safe a known,

9

dangerous condition may be liable even though not in control of the premises at the time of injury. *Page*, 701 S.W.2d at 835.

## VI. Johnson/Ritchie and Johantgen

In issues one through four, Dukes asserts that the trial court erred by granting summary judgment in favor of Johnson/Ritchie and Johantgen because the evidence demonstrated that there were direct contradictions between the testimony of Ritchie, Johantgen, and City Supervisor, Richard Zavala; that Johnson/Ritchie and Johantgen owed duties of care to the public; that Johnson/Ritchie and Johantgen had actual knowledge of the hazard at the Active Water Pool; and that their alleged breach of duties contributed to cause the deaths of the decedents.[2]

---

[2] We will collectively refer to Appellees Philip Johnson/Alan Ritchie Architects, P.C., Philip Johnson, Ritchie & Fiore Architects, P.C., Alan Ritchie, individually, and David. G. Whitney, who is the executor of Philip Johnson's estate as "Johnson/Ritchie" for the sake of clarity. Similarly, although Peter Johantgen and Peter Johantgen Consulting, Inc. are separate parties, we will collectively refer to them as "Johantgen."

We note that Dukes refers to all of the aforementioned parties as the "New York Architects" in issues one through four. However, Peter Johantgen and Peter Johantgen Consulting, Inc., together, are represented by different counsel than the other parties in this section, and filed their own, distinct motions for summary judgment. For that reason, we will *not* collectively refer to these parties as the "New York Architects"; however, we will evaluate Dukes's assertions as to Johnson/Ritchie and Johantgen at the same time.

## A. Applicable Facts

The Water Gardens were originally designed by architects Philip Johnson and John Burgee in 1974. In 1997, the Water Gardens had been in operation for twenty-three years and was in need of repair and restoration. The City considered changing the south wall of the Water Gardens and sought the input of Johnson/Ritchie to help preserve the original design. In December 1997, Ritchie was invited to Fort Worth to review the proposed changes. Subsequently, Richard Zavala, director of the City's Parks and Community Services Department, sent a letter on December 9, 1997, to several individuals, including Johnson/Ritchie, that summarized the meeting between Ritchie and the City regarding the proposed changes to the Water Gardens. The letter considered possible design activity for the Water Gardens if a capital improvement was approved by voters the following year. The letter stated that Johnson/Ritchie would provide a "comprehensive review" of the Water Gardens, including an assessment of "the overall condition[s and] various systems, i.e. lighting, mechanical, electrical, plumbing, etc."

It was not until two years later, on April 22, 1999, that the City contracted with Johnson/Ritchie to review the Water Garden's existing conditions and determine whether the park's features were in compliance with the Americans with Disabilities Act ("ADA"). Subsequently, Johnson/Ritchie

11

hired Peter Johantgen to assist in performing the 1999 review of the Water Gardens.[3]   There was no written contract between Johantgen and Johnson/Ritchie.  According to his affidavit testimony, Johantgen's scope of work was to include a "limited visual inspection of the Water Gardens to document the existing conditions of the site as it relates to repair and restoration of the site to its original condition along with possible ADA issues."

Johantgen performed a visual inspection of the Water Gardens on July 25-27, 1999.  Based on Johantgen's review, Johnson/Ritchie submitted a conditions survey to the City in October 1999.  The City never retained Johnson/Ritchie or Johantgen to design or implement any of the matters identified in the conditions survey.

## B. Applicability of Professional Codes of Ethics in a Duty Analysis

The primary question is whether Johnson/Ritchie and Johantgen owed a duty to the decedents.  Dukes first contends that Johnson/Ritchie and Johantgen owed a duty to the decedents because, as professionals, they were under the ethical obligation to report any unsafe or hazardous conditions that they observed during their review of the Water Gardens.

---

[3] Johantgen had previously worked for Philip Johnson, Ritchie & Fiore Architects, P.C. from 1992-1997.  Mr. Fiore resigned in 1996, and thereafter the firm changed its name to Philip Johnson/Alan Ritchie Architects, P.C. ("Johnson/Richie").

12

Under Texas law, there is no binding authority to support Dukes's proposition that a court must take into consideration professional codes of ethics when conducting a duty analysis. The only case that supports Dukes's position is the concurring opinion of *Winters v. Houston Chronicle Publishing Co.*, in which Justice Doggett noted that

> [b]oth civil and criminal statutes reflect myriad expressions of the public policy to encourage the reporting and correction of activities harmful to our citizenry. This principle is . . . applicable to licensed professionals—physicians, attorneys, and others—which *impose upon them a duty to report* unethical conduct in their profession[.]

795 S.W.2d 723, 731-32 (Tex. 1990) (Doggett, J., concurring) (emphasis added). However, the Texas Supreme Court has more recently observed, albeit in a footnote, that the "Rules [of Professional Conduct] do not define standards of civil liability of lawyers for professional conduct." *Joe v. Two Thirty Nine Joint Venture*, 145 S.W.3d 150, 159 n.2 (Tex. 2004). Because we have not found, nor has Dukes cited, any case law to show the contrary, we determine that professional negligence law has not yet been broadened to include the evaluation of professional codes of ethics in the determination of whether a duty is owed. *See id.* Therefore, we conclude that Johnson/Ritchie and Johantgen had no legal duty arising from their profession as architects to report safety hazards that they may have discovered in their assessment of the Water Gardens.

13

Dukes next asserts that Johnson/Ritchie and Johantgen owed a duty of care arising from Johnson/Ritchie's 1999 contractual relationship with the City.[4] A contract for professional services gives rise to a duty by the professional to exercise the degree of care, skill, and competence that reasonably competent members of the profession would exercise under similar circumstances. *Averitt v. Price Waterhouse Coopers L.L.P.,* 89 S.W.3d 330, 334 (Tex. App.—Fort Worth 2002, no pet.). In contracting for personal services, an architect's or an engineer's duty depends on the particular

---

[4] Although Dukes specifically contends that a duty arose out of Johnson/Ritchie's 1999 contract with the City, throughout their brief Dukes also argues that the 1999 contract is only one of *two* documents that defines the scope of the architects' services, the other document being a 1997 letter from Richard Zavala, Director of the Parks and Community Services Department, to John Robinson, Executive Director of the Amon G. Carter Foundation. The 1997 letter included a summary of the meeting that took place between the department's staff, Ritchie, and Emile Keller, who is Vice-President of Appellee Huitt/Keller, where they discussed possible design changes to the Water Gardens that would be effectuated if a capital improvement was approved by voters the following year.

In our review of the scope of Johnson/Ritchie's and Johantgen's duties, we will not examine the 1997 letter because it does not constitute a valid contract and, therefore, does not define the scope of responsibility. *See Hubbard v. Shankle,* 138 S.W.3d 474, 481 (Tex. App.—Fort Worth 2004, pet. denied) (holding that to constitute a valid contract, there must be an offer, acceptance, meeting of the minds, each party's consent to the terms, execution, and delivery of the contract with the intent that it be mutual and binding). Indeed, Richard Zavala agreed that the 1997 letter was not the contract with Johnson/Ritchie; instead, the actual contract was negotiated and signed in the 1999 agreement. Thus, in evaluating whether a contractual duty existed, we look only to the April 22, 1999 agreement among the parties.

14

agreement entered into with his employer. *I.O.I. Sys., Inc. v. City of Cleveland, Tex.*, 615 S.W.2d 786, 790 (Tex. App.—Houston [1st Dist.] 1980, writ. ref'd n.r.e.). An engineer or an architect must use the skill and care in the performance of his duties commensurate with the requirements of his profession and is only liable for a failure to exercise reasonable care and skill commensurate with those requirements. *Id.*

In this case, we look only to the April 22, 1999 contractual agreement to determine whether Johnson/Ritchie and Johantgen owed a duty to the decedents.[5] The scope of Johnson/Ritchie's duty is determined by this contract. *See id.* (holding that an architect's duty depends on the particular agreement entered into with his employer).

After reviewing the contract, we determine that contrary to Dukes's assertion, the contract did not require Johnson/Ritchie to address safety issues. Although Dukes contends that the 1999 agreement was a "comprehensive review," thus making a safety review necessarily a part of Johnson/Ritchie's responsibilities, our review of the agreement shows that it merely stated that Johnson/Ritchie would provide "a review of existing conditions," including the "pavement, steps, and railings"; the "pools' surfaces, plumbing and lighting";

---

[5] It is undisputed that the April 22, 1999 agreement constituted a valid contract between the City and Johnson/Ritchie.

15

the "changes to the original Water Gardens for compliance with the ADA"; and development of "appropriate repair options and establishing of repair priorities."[6] Nowhere does the contract specify that Johnson/Ritchie had any contractual obligation to report or make safe any hazards that they may have detected in the Water Gardens. Therefore, because Johnson/Ritchie's duty depends on the contract they entered into with the City, and because there is no evidence that the contract required Johnson/Ritchie to report or make safe any hazards detected, we determine that Dukes's assertion that Johnson/Ritchie owed a duty to the decedents arising from Johnson/Ritchie's contractual relationship with the City is without merit. *See, e.g., Entex, A Div. of Noram Energy Corp. v. Gonzalez,* 94 S.W.3d 1, 11 (Tex. App.—Houston [14th Dist.] 2002, pet. denied) (holding that gas provider did not have a negligence duty arising from its contractual relationship because the contract only required that the gas provider change the meter and did not require them to inspect, repair, or warn about the water heater).

---

[6] The 1997 letter summarizing the meeting between Ritchie, Zavala, and others included the words "comprehensive review." However, the 1999 contract contains no such language. Although Dukes attempts to intermingle the language of the two documents to provide support for their contention that the scope of Johnson/Ritchie's review necessarily included a safety analysis, we have already stated that we will only examine the 1999 contractual agreement to determine the scope of Johnson/Ritchie's responsibilities.

16

Similarly, the summary judgment evidence shows that the scope of Johantgen's duties did not include a safety review. Johantgen's duty was defined by the scope of his agreement with Johnson/Ritchie to act as a consultant pursuant to Johnson/Ritchie's 1999 contract with the City to provide a review and assessment of the Water Gardens. *See I.O.I. Sys. Inc.*, 615 S.W.2d at 790 (holding that in contracting for personal services, an architect's duty depends on the particular agreement entered into with his employer). The summary judgment evidence shows that Johantgen was asked by Johnson/Ritchie to do a limited visual inspection of the Water Gardens to document the existing conditions as it related to repair and restoration of the site to its original condition, along with possible ADA issues, and that the scope of his work did not include a review of the safety issues or hazards at the site. Dukes has not presented any evidence showing that the scope of Johantgen's work included a safety review. Therefore, because Dukes has failed to present any evidence showing otherwise, we hold that Johantgen owed no duty to the decedents to report any safety hazards observed during Johantgen's 1999 review of the Water Gardens.

## C. Premises Liability

Dukes next argues that Johnson/Ritchie and Johantgen owed a duty under premises liability law. Dukes first contends that Johnson/Ritchie and

17

Johantgen owed a duty because they recognized that there were hazards in the Water Gardens and that drowning was a foreseeable result of such hazards.

In their effort to show that a court may consider the forseeability[7] of harm in determining whether the defendant exercised the duty of reasonable care, Dukes cites *Corbin v. Safeway Stores, Inc.*, 648 S.W.2d 292 (Tex. 1983). However, the analysis in that case deals exclusively with the duty that an occupier of premises owes to invitees. While there is no dispute that the decedents were invitees, there is also no dispute that the City was the owner and occupier in exclusive control of the Water Gardens. Indeed, aside from Johantgen's 1999 walk-through of the Water Gardens, Johnson/Ritchie and Johantgen never conducted any work at the Water Gardens, nor did the City ever contact them to implement any of the recommendations contained in the conditions survey. Nor has Dukes presented any evidence indicating that Johnson/Ritchie or Johantgen had exclusive control over the Water Gardens. Therefore, whether Johnson/Ritchie and Johantgen exercised reasonable care to the decedents is of no consequence simply because Johnson/Ritchie and Johantgen were neither the owners of the Water Gardens, nor were they an

---

[7] As pointed out by Johantgen, foreseeability is part of causation, and his motion for summary judgment was based on no duty, not a lack of causation.

18

occupier in exclusive control of the premises. *See Alexander*, 868 S.W.2d at 324; *Page*, 701 S.W.2d at 835. Accordingly, no duty of reasonable care may be imposed upon Johnson/Ritchie and Johantgen under general premises liability law. *See Alexander*, 868 S.W.2d at 324; *Page*, 701 S.W.2d at 835.

If the general rule of premises liability is inapplicable, a party may be held liable under a premises liability analysis only if the party has agreed to make safe a known, dangerous condition on the premises and failed to do so or if the party has created the dangerous condition. *See Page,* 701 S.W.2d at 835.

To determine whether either exception applies, we examine the summary judgment evidence. However, even viewing the evidence in the light most favorable to Dukes, we determine that neither Johnson/Ritchie nor Johantgen ever expressly or impliedly agreed to make safe a known, dangerous condition, nor did they create the dangerous condition. *See id.* (evaluating whether the City of Denton ever expressly or impliedly contracted to remedy any dangerous condition on the property). Johnson/Ritchie's contract with the City required them to provide only a review of the Water Gardens' existing conditions so that the City could repair and restore the Water Gardens consistent with the original design and to comply with the ADA. The contract imposed no responsibility upon Johnson/Ritchie to remedy the problems that they discovered in the course of their review. Thus, the contract itself demonstrates that

19

Johnson/Ritchie never expressly agreed to make safe a known, dangerous condition, and Dukes has not presented any competent evidence that would raise a genuine issue of material fact showing otherwise. *See Centeq Realty, Inc.,* 899 S.W.2d at 197. Nor has Dukes presented any evidence raising a genuine issue of material fact that Johnson/Ritchie or Johantgen impliedly agreed to remedy a known, dangerous condition or that they created the condition.

Furthermore, Dukes's attempt to analogize this case to *Crown Derrick Erectors, Inc. v. Dew*, 117 S.W.3d 526 (Tex. App.—Beaumont 2003), *rev'd on other grounds*, 208 S.W.3d 448 (Tex. 2006) is misplaced. In that case, Crown Derrick left a hole in an elevated rig walkway unguarded except for a small rope barrier. *Id.* A worker subsequently fell through the hole to his death. *Id.* The court imposed liability only because Crown Derrick was "acting to correct a danger it agreed to correct and that arose out of its own work." Dukes argues that just as liability was imposed on Crown Derrick because it had undertaken to erect a barrier to protect a dangerous area on its work site, liability should also be imposed in this case because Johnson/Ritchie and Johantgen "took half-steps to address the potential hazard" by reporting their observation of algae

20

growth in the 1999 report.[8]  However, the imposition of liability upon Crown Derrick turns on the fact that it was "acting to correct a danger it *agreed to correct* and that arose out of its own work." *See id.* at 532 (emphasis added). As we previously discussed, Dukes has not raised a genuine issue of material fact that Johnson/Ritchie or Johantgen ever expressly or impliedly agreed to correct any problems discovered in the course of their review.  Thus, they had no duty to correct any potential hazard that they observed.

After reviewing the evidence, we determine that Dukes has failed to raise a genuine issue of material fact that either Johnson/Ritchie or Johantgen agreed to make safe a known, dangerous condition and failed to do so or that they created the hazardous condition. *See Page*, 701 S.W.2d at 835.  Therefore, we determine that no duty was imposed on Johnson/Ritchie and Johantgen under premises liability law.

**D. Voluntary Undertaking of a Duty**

We now turn to Dukes's third proposed source of a negligence duty, an undertaking theory.  Dukes contends that Johnson/Ritchie's 1999 agreement

---

[8] Dukes asserts that Johantgen observed a hazard in the form of "algae or growth or fungus or something like this" on the stepping stones around the Active Water Pool that created a slipping risk for falls into the pool and that liability should be imposed because "the architect's report only made an obscure reference to cleaning of organic deposits[] and [said] nothing about a drowning hazard."

21

"clearly state[s] that the respective assessments were to cover all areas of the Water Gardens" and that a "duty may be established by a showing that [Johnson/Ritchie and Johantgen] undertook inspection of the entire park."

The Texas Supreme Court has stated that "one who voluntarily undertakes an affirmative course of action for the benefit of another has a duty to exercise reasonable care that the other's person or property will not be injured thereby." *Colonial Sav. Ass'n v. Taylor*, 544 S.W.2d 116, 119 (Tex. 1976); *Tex. Woman's Univ. v. Methodist Hosp*., 221 S.W.3d 267, 283-84 (Tex. App.—Houston [1st Dist.] 2006, no pet.). If one undertakes to make the premises safe for others, he or she owes a duty to use due care to make the premises safe. *Crooks v. M1 Real Estate Partners, Ltd.,* 238 S.W.3d 474, 489-90 (Tex. App.—Dallas 2007, pet. filed). "Due care" is that degree of care which a person of ordinary prudence would exercise under the same or similar circumstances. *Id.* The court in *Colonial Savings* cited section 323 of the Second Restatement of Torts, which provides:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if (a) his failure to exercise such care increases the risk of such harm, or (b) the harm is suffered because of the other's reliance upon the undertaking.

22

*See Colonial Sav. Ass'n*, 544 S.W.2d at 128.  Thus, to establish a negligent undertaking, a plaintiff must show: (1) the defendant undertook to perform services that it knew or should have known were necessary for the plaintiff's protection; (2) the defendant failed to exercise reasonable care in performing those services; and either (3) the plaintiff relied upon the defendant's performance; or (4) the defendant's performance increased the plaintiff's risk of harm.  *Torrington Co. v. Stutzman*, 46 S.W.3d 829, 839 (Tex. 2000); *Crooks,* 238 S.W.3d at 489-90.

In their attempt to persuade this court that Johnson/Ritchie and Johantgen undertook a duty through their inspection of the Water Gardens, Dukes cites *Torrington Co.*, 46 S.W.3d at 839.  In that case, Torrington was sued after a Navy helicopter crashed and killed two Marines.  *Id.*  Torrington's subsidiary had manufactured the bearing that had failed in the helicopter.  *Id.*  After an earlier crash of a civilian helicopter with a similar bearing, Torrington had written a letter to Bell Helicopter stating that it was "most anxious to participate in any evaluation you are currently performing."  *Id.*  The letter also stated that Torrington intended to "continue to actively participate with the [National Transportation Safety Board] in their investigation."  *Id.*  The Texas Supreme Court held that Torrington's letter to Bell Helicopter was an undertaking of some type.  However, the facts about the scope of the assumed

23

duty were in dispute, and therefore, the issue should have been determined by the jury.[9] *Id.*

Although Dukes cites *Torrington* to support their argument that Johnson/Ritchie assumed a duty by undertaking the inspection of the Water Gardens, we determine that such reliance is misplaced. Whereas the court in *Torrington* was able to specifically point to Torrington's letter to Bell Helicopter as an undertaking in which Torrington voluntarily broadened its duty, Dukes has failed to demonstrate an affirmative act undertaken by Johnson/Ritchie or Johantgen that broadened the scope of their duty. Although Dukes argues that Johnson/Ritchie and Johantgen's inspection of the Water Gardens was a voluntary undertaking, they have failed to explain how such action is anything more than the architects' complying with their existing contractual obligation. We have already determined that Johnson/Ritchie's contractual agreement with the City defined the scope of their duty and that such a duty did not include a

---

[9] The court held that the jury should have been instructed that Torrington was negligent only if (1) Torrington undertook to perform services that it knew or should have known were necessary for the plaintiffs' protection, (2) Torrington failed to exercise reasonable care in performing those services, and either (3) the Navy relied upon Torrington's performance, or (4) Torrington's performance increased the plaintiffs' risk of harm. *Id.* at 838-39.

safety assessment.[10]  To hold that Johnson/Ritchie and Johantgen voluntarily assumed a duty simply by performing an assessment of the Water Gardens, an action that was in strict compliance with their contractual obligation, does not comport with the general rule that an architect's duty depends on the particular agreement entered into with his employer.  *See I.O.I. Sys., Inc.,* 615 S.W.2d at 790.  We will not disregard the plain language of the contract that clearly defines the scope of the architects' duty merely because Dukes argues that the voluntary undertaking doctrine applies.

Moreover, even if Dukes presented evidence that Johnson/Ritchie and Johantgen undertook a duty, which Dukes has not, liability still would not be imposed upon Johnson/Ritchie and Johantgen under the voluntary undertaking theory because Dukes has failed to present a genuine issue of material fact to show that the City relied on Johnson/Ritchie and Johantgen's 1999 assessment of the Water Gardens or shown that their inspection increased the risk of harm.  *See Entex,* 94 S.W.3d at 10.

---

[10] Dukes contends that "factual disputes regarding the extent and scope of the undertaking by [Johnson/Ritchie and Johantgen]. . . . at the Water Gardens should be submitted to a jury for a factual finding.  The issue cannot be decided as a matter of law."  However, Dukes fails to explain what the factual disputes are regarding the purported undertaking that Johnson/Ritchie and Johantgen voluntarily assumed.

Dukes attempts to show that the City relied on Johnson/Ritchie and Johantgen's work because both Johnson/Ritchie and Johantgen conceded that it was appropriate for the City to rely on their work. Specifically, Dukes points to the following affidavit testimony to argue that the City relied upon their professional expertise:

> Q: (By Mr. Ford) But all I'm saying is the City has the right to rely on [architects and contractors and engineers whom the City has paid millions of dollars], true?
>
> . . . .
>
> A: (By Mr. Ritchie) Well, yeah, but that's our responsibility.
>
> . . . .
>
> Q: (By Mr. Ford) . . . [W]ould you agree that it would be appropriate for . . . [the City] to rely upon Phillip Johnson, Alan Ritchie Architects to perform that function of setting priorities?
>
> . . . .
>
> A: (By Mr. Ritchie) Given the criteria that you've stated, it would stand to reason that, yes.

Although this evidence demonstrates that the City was entitled to rely on Johnson/Ritchie and Johantgen's assessment, it is not evidence that the City actually relied on their assessment. In contrast, the summary judgment evidence shows that the City never contacted Johnson/Ritchie or Johantgen regarding any of the changes they suggested, nor did the City implement any

26

of the suggestions or modifications contained in the 1999 conditions survey. Even viewing this evidence in the light most favorable to Dukes, it does not establish reliance, merely because Dukes has shown that the City could have relied on the architect's review does not mean that they actually did rely on it.

Nor has Dukes presented a genuine issue of material fact to show that Johnson/Ritchie and Johantgen's inspection of the Water Gardens increased the risk of harm. Dukes has not presented any evidence to show that any risk of harm from the Water Gardens, and specifically the Active Water Pool, was greater as a result of Johnson/Ritchie and Johantgen's 1999 assessment than it had been before it. *See Entex,* 94 S.W.3d at 10 (holding that in determining whether there is an increased risk of harm, we compare the risk of harm resulting from the negligence to that existing before the undertaking). Although Johnson/Ritchie and Johantgen included their observation that algae or some other organic growth was detected on the concrete surfaces in the conditions survey, Dukes has not shown how the risk of harm was greater because of their observation. Nor has Dukes presented any evidence to show that the risk of harm was greater after their review than it was before the City contracted with them.

Because Dukes has failed to present competent, controverting evidence raising a genuine issue of material fact that Johnson/Ritchie and Johantgen

27

owed a duty to the decedents, we determine that the voluntary undertaking rule is inapplicable. Therefore, whether Johnson/Ritchie and Johantgen owed a duty is a question of law that was properly determined by the trial court. *See Timberwalk Apartment Partners*, 972 S.W.2d at 756.

**E. Conclusion**

Thus, based on the summary judgment evidence, we determine that Dukes has failed to present a genuine issue of material fact that Johnson/Ritchie or Johantgen owed or assumed any duty to the decedents. *See Centeq Realty, Inc.*, 899 S.W.2d at 197. Thus, the summary judgment evidence conclusively proves, as a matter of law, that Johnson/Ritchie and Johantgen's work on the Water Gardens restoration project gave rise to no legal duty. Accordingly, we overrule Dukes's issues one through four and affirm the trial court's summary judgment as to Johnson/Ritchie and Johantgen.

## VII. Huitt/Keller

In issues five through eight, Dukes argues that the trial court erred by granting summary judgment to Huitt/Keller because the evidence demonstrated that there were direct contradictions between testimony of Emile Keller[11] and City Supervisor, Richard Zavala; that Huitt/Keller owed duties of care to the

---

[11] Emile Keller is the Vice-President of Huitt-Zollars (collectively "Huitt/Keller").

28

public; that Huitt/Keller failed to safeguard dangers; and where Huitt/Keller had actual knowledge of the hazard at the Active Water Pool that contributed to cause the deaths of the decedents.

## A. Applicable Facts

On January 7, 1994, the City contracted with Huitt/Keller to perform an architectural assessment of the Water Gardens. The contract required Huitt/Keller to provide an assessment of the Water Gardens and provide the City with a report based on their findings. The scope of services included an assessment of the existing civil, structural, mechanical, and electrical engineering services.[12] As part of their contractual agreement, Huitt/Keller was to submit both a 30% preliminary review as well as a final report after all reviews of the Water Garden had been completed.[13] The 30% review was submitted on March 7, 1994, and the final report was delivered on November 1, 1994.

---

[12] Huitt/Keller was to "conduct a detailed investigation of the site, . . . document all problem areas" that were "contributing to multiple systems deterioration," and recommend solutions.

[13] The "30% Preliminary Review" was given to the City when Huitt/Keller was one-third of the way through the project. According to Keller's deposition testimony, the purpose of the review was "[t]o get feedback from the City on the direction in which [Huitt/Keller] [was] going and [to] get comments from [the City]."

On April 26, 1995, the City again contracted with Huitt/Keller to perform an assessment of the Water Gardens. The scope of this assessment greatly differed from the 1994 contract, in that under the terms of the 1995 contract, Huitt/Keller was to focus solely on designs for the construction of ADA improvements. The 1995 contract describing Huitt/Keller's services stated that Huitt/Keller was to

> [p]erform architectural and engineering design services for the construction of ADA improvements to the Fort Worth Water Gardens, to include ramps, a viewing platform, safety curbs at the Cascade Pool, and handrails for stairways leading to the Quiet Pool.

The 1995 assessment did not involve a review of the Active Water Pool. On October 13, 1995, Huitt/Keller delivered its report assessing necessary ADA improvements.

On May 5, 2000, the City again contracted with Huitt/Keller to participate in a workshop to review planning of future development around the Water Gardens. The work Huitt/Keller provided in this instance was very limited in scope and was only for the participation in a general study regarding future development.

**B. Applicability of Professional Codes of Ethics in a Duty Analysis**

Dukes argues that because Huitt/Keller had actual knowledge of the hazard at the mouth of the Active Water Pool in 1994, and yet failed to include

30

such knowledge in their final report, they should be liable.[14] Specifically, Dukes argues that such liability may be imposed because professional codes of ethics require a professional to report conditions which could endanger public safety and health.

As we have already determined, under Texas law, there is no binding authority to support the Dukes's proposition that a court must take into consideration professional codes of ethics when determining whether a duty is owed. *See, e.g., Joe,* 145 S.W.3d at 159 n.2 (stating that the Texas Rules [of Professional Conduct] do not define standards of civil liability of lawyers for professional conduct). We will not expand the legal exposure of design professionals beyond their contractual undertaking, and therefore we determine that no liability may be imposed upon Huitt/Keller merely because of their role as professional architects.

## C. Premises Liability

Dukes next argues that Huitt/Keller owed a duty under a premises liability analysis because they recognized the hazards existing in the Water Gardens and

---

[14] Huitt/Keller's 1994 final report stated that "[the Active Water Pool] is the most prominent, as well as the most hazardous. . . ." Emile Keller acknowledged that the unprotected edges at the stepping stones adjacent to the water falling into the Active Water Pool were also potentially hazardous.

that drowning was a foreseeable event.[15]  However, after reviewing the evidence in the light most favorable to Dukes, we determine that Huitt/Keller cannot be held liable under the general rule of premises liability because there is no dispute that Huitt/Keller was neither the owner nor occupier in exclusive control of the Water Gardens.  Because the prerequisite to liability has not been met, Huitt/Keller cannot be held liable for the decedents' deaths.  *See Page*, 701 S.W.2d at 835 (holding that the prerequisite to liability is whether the party is a "possessor" or "owner" of the premises, and if the party does not own, occupy, or otherwise control the premises, they cannot be held liable for dangerous conditions on the property).

We next evaluate whether Dukes presented any controverting evidence that Huitt/Keller owed a duty under either of the recognized exceptions to the general rule of premises liability.  Under these exceptions, a party may be held liable under a premises liability analysis only if the party has agreed to make safe a known, dangerous condition on the premises and failed to do so, or the party has created the dangerous condition.  *See id.*

---

[15] Dukes does not specify the hazard to which they are referring, but we presume that they are referring to "the hazard at the mouth of the Active Water Pool."

32

To determine whether the first exception applies, we examine the summary judgment evidence to determine whether Huitt/Keller ever expressly or implicitly agreed to make safe a known, dangerous condition. *See id.* (evaluating whether the City of Denton ever expressly or impliedly contracted to remedy any dangerous condition on the property).

Huitt/Keller's first contract with the City was executed on January 7, 1994. This contract required them to provide an architectural assessment of the Water Gardens and included the review of civil, structural, mechanical, and electrical engineering services.[16] Our review shows that the 1994 contract did not include an express provision requiring Huitt/Keller to conduct a review of safety issues; however, Dukes points to several extraneous documents that allegedly indicate that a safety review was within the scope of Huitt/Keller's duties. Dukes directs us to an April 11, 1995 document that recommends that the City execute a contract with Huitt/Keller. This document references the

---

[16] Huitt/Keller's responsibilities under their 1994 contract were divided into three phases: the preliminary assessment phase ("30% Preliminary Review"), in which Huitt/Keller was required to "identify the primary areas of concern" and "tabulate all problem areas"; the final assessment phase, in which they were to "identify all problem areas contributing to multiple systems deterioration" and to "research and develop solution options for each of the problem types"; and, the assessment report phase, in which Huitt/Keller was to develop a report addressing each of the various problems and recommend solutions.

City Council's December 14, 1993 approval of a professional services contract with Huitt/Keller requiring Huitt/Keller to conduct an architectural assessment of the Water Gardens for "planning of remedial projects in order to address *safety*, structural, operational, and accessibility issues." [Emphasis added.] Dukes contends that this document is evidence that "safety was to be a primary concern" in Huitt/Keller's review of the Water Gardens.

We determine that although this evidence demonstrates that the City may have initially contemplated that Huitt/Keller was expected to address safety issues in their assessment of the Water Gardens, the actual contract between the City and Huitt/Keller imposed no responsibility upon Huitt/Keller to address or remedy safety issues that they discovered in the course of their assessment.[17] Nor did Huitt/Keller's 1995 and 2000 contractual agreements with the City demonstrate that Huitt/Keller expressly agreed to make safe a known, dangerous condition. Rather, the 1995 and 2000 contracts, respectively, required Huitt/Keller only to determine necessary design services for the construction of ADA improvements to the Cascade and Quiet Pools as well as review planning of future developments around the Water Gardens.

---

[17] The actual contract between the City and Huitt/Keller was executed on January 7, 1994, approximately three weeks after the City Council approved the professional services contract.

34

A review of each of Huitt/Keller's contracts with the City demonstrate that Huitt/Keller never expressly or impliedly agreed to make safe a known, dangerous condition. Nor has Dukes presented any evidence showing otherwise. And as we have previously stated, the scope of Huitt/Keller's duty is determined by their contracts with the City. *See I.O.I. Sys., Inc.,* 615 S.W.2d at 790 (holding that an architect's or engineer's duty depends on the particular agreement entered into with his employer). Furthermore, Dukes has failed to present any evidence raising a genuine issue of material fact that Huitt/Keller created the hazardous condition. *See Centeq Realty, Inc.,* 899 S.W.2d at 197.

Moreover, we are unpersuaded by Dukes's argument that liability should be imposed upon Huitt/Keller because they took "half-steps to address the potential hazard" by withdrawing their recommendation for safety barriers around the Active Water Pool in reliance on discussions with the City after submitting the 30% report. Once again, Dukes attempts to analogize this case to *Crown Derrick Erectors, Inc.*, 117 S.W.3d at 526, and once again, we determine that such reliance is misplaced. Dukes has not presented any evidence that Huitt/Keller ever agreed to correct any problems discovered in their work at the Water Gardens. Thus, *Crown Derrick's* analysis is inapplicable because there is no evidence that Huitt/Keller was "acting to correct a danger

35

*it agreed to correct* and that arose out of its own work." *See* 117 S.W.3d at 526 (emphasis added). Therefore, no duty may be imposed upon Huitt/Keller for withdrawing their recommendation for safety barriers.

After reviewing the record, and viewing the evidence in a light most favorable to Dukes, we determine that Dukes has failed to present controverting evidence that a duty was imposed upon Huitt/Keller through premises liability.

**D. Voluntary Undertaking**

Lastly, Dukes argues that Huitt/Keller can be held liable for the decedents' deaths because Huitt/Keller undertook inspection of the Water Gardens' entire park pursuant to their 1994 agreement with the City.

Once again, we determine that Dukes's attempt to impose a duty through the voluntary undertaking theory necessarily fails. Specifically, even if Dukes presented evidence that Huitt/Keller undertook a duty, liability still would not be imposed upon them because Dukes has failed to present a genuine issue of material fact that the City relied on Huitt/Keller's 1994 inspection of the Water Gardens or that their inspection of the Water Gardens increased the risk of harm. *See Entex,* 94 S.W.3d at 10.

Although Dukes asserts that liability may be imposed because Huitt/Keller incorporated a recommendation for safety barriers around the Active Water Pool in their preliminary report and suggested that the City post signs or warnings

36

around the Active Water Pool in their final report, Dukes has not presented evidence that the City relied on these recommendations. Indeed, the summary judgment evidence shows that the City chose not to implement any of Huitt/Keller's recommendations or any other modification that Huitt/Keller suggested pursuant to their 1994 assessment of the Water Gardens. Specifically, the summary judgment evidence shows that the City rejected these recommendations because it felt that the "liability potential [was] not high," and although the Active Water Pool was "potentially dangerous," "people have not been falling in." Thus, the evidence is clear that the City did not rely on any alleged undertaking that Huitt/Keller may have assumed.

Furthermore, Huitt/Keller's inspection of the Water Gardens did not increase the risk of harm. Dukes has failed to present evidence showing that any risk of harm from the Water Gardens was greater as a result of Huitt/Keller's assessment than it had been before the assessment. *See Entex,* 94 S.W.3d at 10. In contrast, the uncontroverted evidence shows that at the time of Huitt/Keller's 1994 assessment of the Water Gardens, the City knew of the danger that the Active Water Pool posed.[18] For example, the record

---

[18] Dukes acknowledges that the "dangers of the Active Water Pool existed at the time of both the 1994 assessment by [Huitt/Keller] and [the] 1999 comprehensive review by [Johnson/Ritchie and Johantgen]."

shows that in 1994, the City was aware of the dangers posed by the Active Water Pool but that it reasoned that the "liability potential [was] not high." Moreover, the record also contains evidence that as early as 1974, the City knew of the dangers posed by the Active Water Pool. Indeed, the City's attorney expressed his concern to the director of Parks and Recreation that there were:

> dangerous and hazardous conditions existing in the nature of deep, exposed open pit areas with steep embankments lubricated with flowing water into which children of all ages can readily fall and slide.

The record also shows that a safety audit was conducted in 1974 that alerted the City that "should someone fall into [the Active Water Pool,] it would be practically impossible for them to get out without adequate help." This evidence demonstrates that the risk of harm was equally as great before Huitt/Keller conducted their assessment in 1994 as it was after their assessment. And Dukes has not presented evidence showing otherwise.

Because there is no genuine issue of material fact that the City relied on Huitt/Keller's 1994 inspection of the Water Gardens or that such inspection increased the risk of harm, we conclude that Dukes has failed to show that Huitt/Keller voluntarily undertook a duty through their 1994 inspection of the Water Gardens.

38

## E. Conclusion

Even viewed in a light most favorable to Dukes, there is insufficient evidence to create a genuine issue of material fact that Huitt/Keller owed or assumed any duty to the decedents. Accordingly, we overrule Dukes's issues five through eight and affirm the trial court's summary judgment as to Huitt/Keller.

## VIII. Austin

In issues nine, ten, and eleven, Dukes asserts that the trial court erred by granting summary judgment in favor of Austin because the evidence demonstrates that there were safety hazards at the Active Water Pool that were known to Austin's subcontractors, and yet no action was taken; where Austin owed duties to the public; and where Austin's failure to safeguard the hazards at the Active Water Pool contributed to the cause of decedents' deaths.[19]

## A. Applicable Facts

In 2001 through 2002, Austin was under contract with the City to act as the project manager for the Project. Under the original contract, Austin was

---

[19] Again, Dukes does not specify the hazard to which they are referring, but we presume that they are referring to "the hazard at the mouth of the Active Water Pool."

both the construction manager and program manager, which meant that it had the "exclusive control of, and the exclusive right to control the details of the work performed" in conjunction with the Project.

After the City began renovating the Convention Center, it became imperative for the City to also update the Water Gardens. Subsequently, the City and Austin entered into two amendments to the original contract. The second amendment provided that Austin would contract with Johnson/Ritchie "for the preparation of a Master Plan for the incorporation of the Water Gardens into the Project." However, none of Austin's work concerned the Active Water Pool.

## B. Analysis

Dukes argues that Austin was responsible for the negligence of the architects and engineers whose work it supervised and coordinated because under the original and amended contracts, Austin possessed the right to control the work of individuals whom it coordinated.[20] Thus, because Austin retained

---

[20] Although Dukes raises three issues on appeal as to Austin, the only argument that is analyzed and supported by law is their contention that by retaining control over their subcontractor's work, Austin is responsible for their negligence. Therefore, this is the argument that we now address.

control of their work, Dukes asserts that Austin was responsible for the errors and omissions of its subcontractors.[21]

We have closely reviewed the record in this case for evidence supporting Dukes's contention that liability should be imposed upon Austin; however, we are unpersuaded by Dukes's arguments. Even if Austin's contract with the City imposed a duty upon it, Austin still could not be held liable for the negligence of its subcontractors simply because Dukes failed to present evidence demonstrating that these subcontractors owed a duty to decedents. *Phillips,* 801 S.W.2d at 525. By failing to establish the threshold issue of duty, the issue of whether the subcontractors were negligent could not be reached. *Id.* Therefore, any inquiry into whether Austin may be held liable for its subcontractors is a nonissue. Accordingly, we overrule Dukes's issues nine, ten, and eleven and affirm the trial court's summary judgment as to Austin.

---

[21] "Subcontractors" incorporates Johnson/Ritchie as well as Johantgen who was retained by Johnson/Ritchie to act as a consultant in their 1999 assessment of the Water Gardens.

## IX. Conclusion

Because Dukes has failed to present competent, controverting evidence raising a genuine issue of material fact that Johnson/Ritchie, Johantgen, Huitt/Keller, or Austin owed a duty to the decedents, we affirm the trial court's summary judgment as to each of these parties. *See Centeq Realty, Inc.,* 899 S.W.2d at 197.

BOB MCCOY
JUSTICE

PANEL B:   LIVINGSTON, WALKER, and MCCOY, JJ.

DELIVERED: March 27, 2008