02-11-197-CV









 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

 

NO. 02-11-00197-CV

 

 


 
 
 City of Haltom City
 
 
  
 
 
 APPELLANT
 
 
 
 
  
 V.
  
 
 
 
 
 Brian Aurell, Individually and as Next Friend of
 Ranger Hunter Aurell, A Minor; Jacki Chantell Sexton-Aurell, Individually;
 Aaron Collins, Individually and as Representative of the Estate of
 Alexanderia Collins; and Natasha Collins, Individually and as Representative
 of the Estate of Alexanderia Collins and as Next Friend of Cheslea McMaster
 
 
  
 
 
 APPELLEES
 
 


 

 

----------

 

FROM THE 48th
District Court OF Tarrant COUNTY

----------

 

OPINION

----------

          In
this interlocutory appeal,[1] appellant City of Haltom
City (the City) appeals the trial court’s order denying its motion for summary
judgment concerning the claims brought by appellees, whom we have listed
above.  In five issues, the City argues that the trial court does not have
jurisdiction over appellees’ claims because the City’s immunity has not been
waived.  We reverse the trial court’s order denying the City’s motion for
summary judgment, and we render a judgment dismissing appellees’ lawsuit
against the City with prejudice.

Background
Facts

          Over
the course of many years prior to June 2007, Skyline Mobile Home Estates
(Skyline), which is located in the northern part of Haltom City, flooded numerous
times when the City received heavy rain.  During those floods, members of the
Haltom City Fire Department (HCFD) would sometimes have to evacuate and rescue people
who were in Skyline and to barricade some areas of Skyline to make them
inaccessible.  In March 2007, for example, members of the HCFD, at their own risk,
performed a swift water rescue in Skyline.  In that flood, approximately forty
people were evacuated, and several homes sustained damage.  Between March 2007
and June 2007, the City did not take any action to protect Skyline’s residents
from flooding except creating a policy that allowed the mayor to force
evacuations in the event of another flood.

          Parts
of Skyline are in low-lying areas near Whites Branch Creek, and those parts are
therefore prone to flooding.[2]  The HCFD, on its own
initiative, therefore monitored Skyline, the City’s worst area for flooding,
during times of heavy rain.  But neither Skyline nor the City regularly informed
Skyline’s residents of the danger of flooding there before June 2007.

          On
the night of June 17, 2007, storms with heavy rain moved into the North Texas
area.  At about midnight, an HCFD lieutenant, Greg Wagner, went to Skyline.  At
that time, it was not raining, there was no flooding, and the forecast did not
call for more heavy rain.  After midnight, in the early morning of June 18, the
HCFD received a call from the city of Keller about flooding there, and members
of the HCFD used a boat to rescue people who were trapped on the roof of a car
that was in swift-flowing floodwater.

          At
1:30 a.m. on June 18, Skyline was not flooding.  But by about 2 a.m., when Lieutenant
Wagner and other HCFD employees, including HCFD Chief Wes Rhodes, returned to
Skyline with the same boat that they had used in Keller, they found that water
had risen past the banks of the creek.[3]  Eventually, Skyline
residents began to call 911; the water had risen several feet and was high
enough that some residents had to get on the roofs of their mobile homes.  Although
Lieutenant Wagner had worked for the HCFD for many years, he had never seen
flooding that bad in Skyline.  Several cities, including Fort Worth, sent crews
to Skyline.  Lieutenant Wagner, along with others, entered Skyline to rescue dozens
of its residents, including a man and a child who were holding onto a tree.  At least
twenty-four HCFD personnel responded to the emergency at Skyline.

          Jacki
Chantell Sexton-Aurell and her husband, Brian, lived in Skyline in June 2007.  On
June 17, a couple of hours before midnight, Jacki noticed that there was some water
in the trailer park, but the water was not in the streets, and it was not
raining at that time, so Jacki went to sleep.  At around midnight, Jacki awoke
and saw that the water had risen to near the door of her house, which was
elevated about four feet off of the ground.  Jacki and her eight-year-old
stepson, Ranger, could not get out of their home, so Jacki called 911.  When Jacki
and Ranger went to Jacki’s bedroom, Jacki smelled gas inside her trailer and
called 911 again.  After the water rose more, the mobile home exploded.  The
explosion threw Jacki and Ranger out of a window and caused them to suffer
severe burns.  Rescuers eventually reached them and took them to an ambulance. 
An engineer later opined that the Aurells’ home had shifted because it was not
properly tied to the ground.  When the home shifted, the gas line broke,
causing the explosion.

          Aaron
Collins also resided in Skyline with his wife, Natasha, their four-year-old
daughter, Alexanderia, and Natasha’s daughter, Cheslea.  They had moved into
Skyline about a month before the June 2007 flood occurred.  On the night of
June 17, a third child, who was Cheslea’s friend, stayed in the Collinses’
mobile home.  According to Natasha, when she went to bed that night, there was
nothing to indicate that a flood was going to occur.  Eventually, Natasha
thought she heard thunder and awoke; she later learned that she had heard the explosion
of the Aurells’ trailer.  By the time Natasha woke up, water was ankle deep in
the Collinses’ mobile home.  Natasha rushed to her daughters’ bedrooms, and by
the time she got there, the water was knee deep.  Natasha stood on a couch with
the three children who were in the home and called 911 while Aaron tried to
open doors.

          Eventually,
Aaron opened the back door and found a small boat outside of the mobile home.  Everyone
in the Collinses’ home entered the boat, but the boat capsized when the rushing
water caused it to slam into another mobile home.  Natasha grabbed the three
girls as the water took Aaron downstream.  The current eventually ripped Cheslea
and her friend from Natasha’s arms, but Aaron was able to catch them, and he
took them to another mobile home.  Another strong current then caused Natasha
to lose balance, and she lost her grip of Alexanderia, the four-year-old girl. 
Aaron tried to catch Alexanderia, but he was not able to.  The current slammed
Natasha into a tree, where she held on and yelled for help.  Aaron dove into
the water but was unable to find Alexanderia.  Rescuers eventually retrieved
Natasha and immediately left again to rescue more people.

          Natasha
told several firefighters that Alexanderia was missing, and Chief Rhodes sent
rescuers to look for her, but they could not find her.  When the sun arose and the
water receded, Alexanderia’s dead body was found in a wooded area that also
contained debris that had been carried away by the flood.[4]

          The
Collinses’ and Aurells’ homes were located in a floodway.[5] 
But neither family had been told that their home was in a flood-prone area.  Both
families have sworn that if they had known of that danger, they would not have
moved into Skyline.

          The
June 2007 flood displaced and damaged several mobile homes within Skyline and
sent two homes and a car into the creek.  The record indicates that the flood
caused more than $1 million in property damage.  When the flood occurred,
Haltom City was not receiving heavy rain.  Chief Rhodes, who had been working
for the HCFD since 1986, said that until the June 2007 Skyline flood, he had never
known flooding to occur in the City when there was no ongoing heavy rain.

          Tarrant
County declared a local state of disaster.  On June 19, 2007, Tarrant County
Judge B. Glen Whitley sent a letter to Governor Rick Perry to ask for state
assistance in responding to the flood.  Officials also asked for and received
federal assistance.  In part by money that the City received from a federal
grant, it eventually began purchasing many Skyline properties that were located
in the floodway or floodplain. Also, in 2008, the City cooperated with other
cities to create a Hazard Mitigation Action Plan, which broadly addressed
potential hazards that could occur in the future.  After the flood, Skyline put
up signs that warned residents about parts of Skyline being located within a
floodplain; the signs cost between $20 and $40 each.

          At
the time that the flood occurred, the City did not own or maintain any land in
or adjacent to Skyline, did not own or control streets in Skyline, did not own or
maintain any part of the creek that flows through or is adjacent to Skyline,
and did not have any “moveable property” in Skyline.[6] 
Also, the City did not require residential property owners, including owners of
mobile homes, to obtain a permit when moving into a home in the City.  Skyline’s
residents did not pay the City directly for water and sewer service; instead,
the City billed Skyline, which billed the residents.  The City did not furnish
electric or gas utility service to Skyline’s residents.

          Appellees
sued the City, Skyline (for negligence and negligence per se), and other
parties.[7]  Against the City,
appellees asserted negligence claims based on special defect and premises
defect theories, citing sections 101.021 and 101.022 of the civil practice and
remedies code.[8]  Appellees also asserted
a claim against the City under Wilson v. Tex. Parks and Wildlife Dep’t,[9]
alleging that the City was liable because it had undertaken a duty to make
Skyline safe and had breached that duty.  Appellees sought damages for their
personal physical and emotional injuries, but they did not seek damages
relating to their property.

          The
City answered appellees’ suit and filed a motion for summary judgment on
traditional and no-evidence grounds.[10]  In the motion, the City
contended that it had immunity from appellees’ claims because it had not
received timely written or actual notice of them;[11]
it did not own, occupy, or control the land where the flooding occurred; it did
not breach any duty that might have been owed to appellees when the flood occurred;
it had performed discretionary, legislative functions with respect to the
enforcement (or lack thereof) or ordinances affecting Skyline; and appellees
had no evidence that the City had assumed or breached a duty under Wilson. 
In appellees’ response to the City’s motion, they dropped their special defect
claim and proceeded only upon their premises defect claim and their claim that
the City had undertaken a duty to protect Skyline’s residents from flooding.  The
trial court denied the City’s motion, and the City brought this appeal.

Governmental
Immunity Generally

          Generally,
a governmental unit, including a city, enjoys immunity from lawsuits for
damages.  See City of Dallas v. Reed, 258 S.W.3d 620, 622 (Tex. 2008); Corbin
v. City of Keller, 1 S.W.3d 743, 746 & n.3 (Tex. App.—Fort Worth 1999,
pet. denied); see also Pakdimounivong v. City of Arlington, 219 S.W.3d
401, 408–09 (Tex. App.—Fort Worth 2006, pet. denied) (“The doctrine of . . .
 governmental immunity prohibits suits against a governmental entity unless
there has been a clear and unambiguous constitutional or statutory waiver of
that immunity.”).  The legislature has provided a narrow waiver of immunity
through the Texas Tort Claims Act (TTCA).  Reed, 258 S.W.3d at 622; Wise
Reg’l Health Sys. v. Brittain, 268 S.W.3d 799, 804 (Tex. App.—Fort Worth
2008, no pet.); Lipan Indep. Sch. Dist. v. Bigler, 187 S.W.3d 747, 751
(Tex. App.—Fort Worth 2006, pet. denied).  A plaintiff’s mere reference to the TTCA,
however, does not confer jurisdiction on the trial court.  Mogayzel v. Tex.
Dep’t of Transp., 66 S.W.3d 459, 464 (Tex. App.—Fort Worth 2001, pet.
denied).

          “The
requirements that a cause of action must meet in order to come within the TTCA’s
waiver of governmental immunity are found in section 101.021 of the Act . . . .” 
Brittain, 268 S.W.3d at 805; see Tex. Dep’t of Criminal Justice v.
Miller, 51 S.W.3d 583, 587 (Tex. 2001) (explaining that the “Tort Claims
Act does not waive . . . immunity for all negligence claims
against governmental units”).  Under section 101.021, governmental units are
liable for, as is relevant to this case, “personal injury and death so caused
by a condition or use of . . . real property if the
governmental unit would, were it a private person, be liable to the claimant
according to Texas law.”  Tex. Civ. Prac. & Rem. Code Ann. § 101.021(2).

          An
assertion of governmental immunity to suit is a challenge of the trial court’s
jurisdiction.  Harris Cnty. Hosp. Dist. v. Tomball Reg’l Hosp., 283
S.W.3d 838, 842 (Tex. 2009); State v. Holland, 221 S.W.3d 639, 642 (Tex.
2007). A motion asserting such immunity involves a question of law that we
review de novo.  Harris Cnty. Hosp. Dist., 283 S.W.3d at 842.  The
motion should not be granted if a material fact issue exists concerning the trial
court’s jurisdiction, but if relevant, undisputed evidence negates
jurisdiction, the motion must be granted.  Holland, 221 S.W.3d at 643. 
“It is the plaintiff’s burden to allege facts that affirmatively establish the
trial court’s subject matter jurisdiction.”  Pakdimounivong, 219 S.W.3d at
407.

The
City’s Immunity from Appellees’ Premises Defect Claim

          In
part of the City’s second issue, it argues that it is immune from appellees’ premises
defect claim because even if appellees could establish that the City had a duty
with respect to the premises at Skyline, appellees did not present evidence
that the City breached that duty.  Specifically, the City contends that it is
immune because the only facts that appellees cite to in an effort to show a
breach of duty by the City are “matters which are antecedent to the flood.”

          “Liability
for premises defects is implied under section 101.021(2) because a premises
defect arises from a condition existing on real property.”  Perez v. City of
Dallas, 180 S.W.3d 906, 910 (Tex. App.—Dallas 2005, no pet.); see also
Dukes v. Philip Johnson/Alan Ritchie Architects, P.C., 252 S.W.3d 586, 592
(Tex. App.—Fort Worth 2008, pet. denied) (“Premises liability is a special form
of negligence.”), cert. denied, 555 U.S. 1138 (2009).  If a claim “arises
from a premise defect, the governmental unit owes to the claimant only the duty
that a private person owes to a licensee on private property, unless the
claimant pays for the use of the premises.”  Tex. Civ. Prac. & Rem. Code
Ann. § 101.022(a); see Reyes v. City of Laredo, 335 S.W.3d 605, 606
(Tex. 2010).

          A
party that has a duty with respect to a premise defect must “not injure a
licensee by willful, wanton, or grossly negligent conduct, and . . . the
[party must] use ordinary care to either warn a licensee of, or make reasonably
safe, a dangerous condition of which the owner is aware and the licensee is not.” 
Corbin, 1 S.W.3d at 747.  To prevail on a premises defect claim under
the TTCA, a plaintiff must prove that the condition of the premises created an
unreasonable risk of harm, that the governmental unit actually knew of the
condition, that the plaintiff did not actually know of the condition, that the
governmental unit failed to exercise ordinary care to protect the plaintiff from
the dangerous condition, and that the governmental unit’s failure to exercise
ordinary care proximately caused the plaintiff’s injury.  Id. at 748; see
State Dep’t of Highways & Pub. Transp. v. Payne, 838 S.W.2d 235, 237
(Tex. 1992) (op. on reh’g).

          The
City sought summary judgment on the basis that appellees had no evidence that
the “City failed to exercise ordinary care to protect [appellees] from [a]
dangerous condition.”  After an adequate time for discovery, the party without
the burden of proof may, without presenting evidence, move for summary judgment
on the ground that there is no evidence to support an essential element of the
nonmovant’s claim or defense.  Tex. R. Civ. P. 166a(i).  The motion must
specifically state the elements for which there is no evidence.  Id.; Timpte
Indus., Inc. v. Gish, 286 S.W.3d 306, 310 (Tex. 2009).  The trial court
must grant the motion unless the nonmovant produces summary judgment evidence
that raises a genuine issue of material fact.  See Tex. R. Civ. P.
166a(i); Hamilton v. Wilson, 249 S.W.3d 425, 426 (Tex. 2008).  When
reviewing a no-evidence summary judgment, we examine the entire record in the
light most favorable to the nonmovant, indulging every reasonable inference and
resolving any doubts against the motion.  Sudan v. Sudan, 199 S.W.3d
291, 292 (Tex. 2006).

          In
the trial court and on appeal, the City has argued that for appellees to
establish a waiver of the City’s immunity for their premises defect claim, they
must show that the City failed to exercise ordinary care to protect appellees
from a dangerous condition and that in this case, the dangerous condition was
the flood that occurred in June 2007 and not some condition that existed at
Skyline before that date.  For this argument, the City relies in part on the
supreme court’s decision in Reyes.

          In
Reyes, Maria Reyes sued the City of Laredo for the wrongful death of her
fourteen-year-old daughter, who drowned when the van in which she was riding was
swept away by water from an overflowing creek during a rainstorm.  335 S.W.3d at
606.  The city asserted governmental immunity, and Reyes argued, in part, that
the city was liable under the TTCA for a premise defect.  Id.  The
supreme court explained that section 101.022(a) of the TTCA limits the
government’s duty to prevent injury from premise defects to those of which it
has actual knowledge.  Id. at 606, 608.  Under that standard and in
light of the evidence that had been presented, the court held that the city was
immune from Reyes’s suit, explaining that the city

knew that the crossing had flooded before during heavy
rains, but “the actual knowledge required for liability is of the dangerous
condition at the time of the accident, not merely of the possibility that a
dangerous condition can develop over time.”

          . . .  Reyes alleges in her petition that the
accident occurred between 3:00 and 3:30 a.m. . . . .  Reyes argues that there
is evidence the City knew of the flooding as early as 12:30 a.m.

          . . . .

          . . .  [T]he most one can reasonably infer [from
a homeowner near the accident site who had called 911 several times about the
rising water] about what the City knew is that at 12:30 a.m., Chacon Creek was
rising, that “there was going to be a problem” at some point, and that the
danger persisted throughout the night. . . .  [O]ne cannot infer that the City
ever actually knew Century Boulevard had flooded, or more especially, that
it was flooding when the accident occurred. . . .  Awareness
of a potential problem is not actual knowledge of an existing danger.  Had
there been testimony that a 911 operator received a credible report at about
the time of the accident that the crossing had actually flooded and was
imperiling motorists, there would have been evidence the City had actual
knowledge of a dangerous condition.

          . . . .

          . . .  The City of Laredo knew Chacon Creek
might flood, but the record does not show that it knew the creek had
flooded at the time of the accident.  One can certainly argue that as a
policy matter, the government should be obliged to do more to protect against
dangerous conditions . . . .  But that choice belongs to the Legislature.

Id. at
608–09 (emphasis added) (citations omitted).

          More
than a decade before deciding Reyes, the supreme court considered
whether a city could be liable for injuries that a plaintiff received at a
city-owned recreation center by slipping on water while playing basketball.  See
City of San Antonio v. Rodriguez, 931 S.W.2d 535, 536 (Tex. 1996).  In
explaining what the relevant “dangerous condition” was in the suit, the court
stated,

          The water on the floor of the basketball court
came from a leak in the roof.  The evidence is undisputed that the City knew of
the leaks in the roof, but the City disputed whether it knew of the water on
the floor at the time Rodriguez slipped.  The court of appeals held that the
jury could have concluded that the leaky roof was the dangerous condition in
the premises, so that the City’s knowledge of the dangerous condition was
conclusively established. We disagree.  The leaky roof was not itself a
dangerous condition; it could only cause a dangerous condition. The City was
not required to warn of leaks in the roof or repair them; it was required only
to prevent the water that leaked through the roof from causing a dangerous
condition.  On retrial, the jury should be instructed that the allegedly
dangerous condition was the water Rodriguez claims was on the floor.

Id. at
536–37 (emphasis added) (citation omitted).

          Between
deciding Rodriguez and Reyes, the supreme court considered whether
the City of Dallas could be liable for a premise defect when a plaintiff
injured herself by tripping on a metal coverplate in an airport.  See City
of Dallas v. Thompson, 210 S.W.3d 601, 602 (Tex. 2006).  After stating that
the city was immune unless “there [was] evidence that it actually knew of the
alleged protruding coverplate,” the court determined that Thompson had
presented no such evidence.  Id. at 602–03.  The court explained,

The lobby area in which Thompson fell was well-traveled,
and passengers and City employees walked through the area daily, including the
day of the fall.  In the hours prior to Thompson’s fall, City employees had
been in the area of the coverplate and probably had walked over it, but no one
reported or observed the coverplate protruding from the floor.  Accident logs
reflected reports of tripping where Thompson did, but none for at least three
years.  The City knew that the coverplate could become loose and raise suddenly
or over time with ordinary wear and tear, and when it did, City employees would
tighten it. . . .

          Thompson argues that the fact that the
coverplate could loosen and protrude over time made the coverplate itself,
actually protruding or not, a dangerous condition, and the City’s knowledge of
this periodic protrusion and the need for inspection and maintenance satisfied
the requirement of actual knowledge.  But we have held that the fact that
materials . . . may become dangerous does not itself create a dangerous
condition, and the actual knowledge required for liability is of the dangerous
condition at the time of the accident, not merely of the possibility that a
dangerous condition can develop over time.  CMH Homes, Inc. v. Daenen,
15 S.W.3d 97, 100–02 (Tex. 2000) (holding that the defendant’s knowledge that
its stair and platform units periodically became unstable was not evidence the
units were unreasonably dangerous, nor evidence of actual or constructive
knowledge that a unit had become dangerous when plaintiff was injured); see
also State v. Gonzalez, 82 S.W.3d 322, 330 (Tex. 2002) (holding that
evidence that the State “knew the [traffic] signs had been repeatedly
vandalized does not indicate, either directly or by reasonable inference, that
[it] actually knew the signs were down before the accident occurred”).

          Thompson argues that the City’s knowledge of
past reports of tripping was sufficient.  But the reports were all far too
remote to show that the City knew of a dangerous condition at the time
Thompson fell.

Id. at
603 (emphasis added).

          Finally,
four years ago, in a premises liability case with facts that are analogous to
the evidence in this appeal, the supreme court determined whether the City of
Corsicana could be liable for the drowning deaths of two children.  See City
of Corsicana v. Stewart, 249 S.W.3d 412, 413 (Tex. 2008).  In Stewart,
Stewart’s car stalled while he attempted to cross a low-water crossing.  Id.
 When he left his children in the car and went away to seek help, the water swept
the car away, and the children drowned.  Id.  The issue before the
supreme court was whether Stewart had presented evidence that created a genuine
factual dispute regarding the city’s actual knowledge of a dangerous
condition.  Id.  The court held that the he had not done so, stating,

          The court of appeals held that in this case,
actual knowledge could be inferred from circumstantial evidence including:  (1) testimony
. . . that the crossing “sometimes” flooded during heavy rains, that the
crossing was designed to allow water to flow over it during heavy rains, and
that the City closed the crossing on several prior occasions due to flooding;
(2) a study commissioned by the City several years prior to the accident
identifying the crossing as vulnerable to future flooding; (3) a former City
Council member’s testimony that she informed City personnel of “dangerous
conditions” at the crossing during “light and heavy rains”; (4) the National
Weather Service’s issuance of four pertinent severe weather warnings on the
afternoon and night preceding the accident; [and] (5) evidence that the Texas
Department of Transportation (TxDOT) closed a road one mile upstream from the
crossing several hours prior to the accident due to flooding . . . .

          . . .  In addition to the evidence relied on by
the court of appeals, Plaintiffs point to statements in the responding officer’s
report at the evidentiary hearing that the rain was intense as he drove to
assist Stewart, that local dispatch was inundated with calls for help from
stranded motorists and flooded homeowners, and that many officers could not
reach those in need due to high water. Plaintiffs further argue that according
to City procedures, City officials are supposed to monitor areas likely to
flood when flooding is anticipated.

          It is undisputed that no direct evidence was
offered that the City knew the crossing was flooded prior to the accident.
Actual knowledge requires knowledge that the dangerous condition existed at the
time of the accident, as opposed to constructive knowledge which can be
established by facts or inferences that a dangerous condition could develop
over time.  Here, the Legislature required that the City actually know that the
crossing was flooded at the time of the accident. . . .

          . . .  [T]he evidence presented in this case
does not reasonably support the inference that the City actually knew the
crossing was flooded on the night of the accident.  Plaintiffs’ evidence
indicates that there was inclement weather in the vicinity of Corsicana on the
night of the accident, that a road one mile upstream was closed due to
flooding, that the City knew the crossing tended to flood during heavy rains,
and that the City was aware of heavy rains and flooding after the accident
occurred.  Neither this evidence nor the inferences arising therefrom raise
a fact question on the City’s actual knowledge that a dangerous condition
existed at or near the crossing at the time of the accident.

Id. at 414–15 (emphasis
added) (citation omitted).

          The
evident theme from these four supreme court decisions is that for a
governmental entity’s duty to arise in a premises liability case, the entity
must have actual knowledge of the existing danger that causes the plaintiff’s
injury, and mere knowledge of an antecedent condition that could have
potentially caused a dangerous condition at a later time is insufficient to
waive the entity’s immunity.  Courts of appeals, including our own court, have
applied this principle in several cases.  For example, in City of Austin v.
Leggett, Trudy Leggett, whose son had drowned after attempting to drive
through a flooded street, sued the city under a premises liability theory,
alleging that the city had negligently maintained or had negligently designed a
stormwater detention pond.  257 S.W.3d 456, 460 (Tex. App.—Austin 2008, pet.
denied).  Leggett argued that the “dangerous condition” in the case was the
pond (and a defective drainage grate) rather than the flooding itself.  Id.
at 469.  The Austin Court of Appeals disagreed, stating that the “relevant ‘dangerous
condition’ for purposes of premises liability [was] not the condition of the
pond or grate, but the flooding in the location where Nathan drowned.”  Id.
at 470.  Citing Rodriguez, among other cases, the court explained,

          The supreme court has repeatedly held that the
relevant unreasonably dangerous condition in a premise liability case is
generally the condition at the time and place injury occurs, not some
antecedent condition or situation that helps create a dangerous condition.

          . . . .

          . . .  [W]e agree with the City that the
unreasonably dangerous condition that is the proper focus of Leggett’s premises
claim is the flooding in the intersection where Nathan drowned, not the
allegedly defective grate or other antecedent condition related to Pond 342
that Leggett claims contributed to the flooding.  In other words, any duty of
the City here could arise only from its knowledge of the flooding in the
intersection, not merely its knowledge regarding the grate or other condition
of the pond condition, and such duty would be to warn or make reasonably
safe the flooded area rather than anything in the pond.  To the extent that
Leggett purports to assert a claim predicated upon an “unreasonably dangerous
condition” in the pond, as opposed to the flooding where Nathan drowned, we
hold that it is barred by governmental immunity.

Id. at
470–71 (citations omitted); see also City of San Antonio v. Tex. Mut. Ins.
Co., No. 04-07-00837-CV, 2009 WL 89700, at *3 (Tex. App.—San Antonio Jan.
14, 2009, no pet.) (mem. op.) (rendering a judgment dismissing claims against a
city because while “the City may have been warned that a . . . sinkhole was
likely, that did not constitute actual knowledge of the dangerous condition.  The
law clearly requires the sinkhole to have developed and the City to be aware of
its existence.”); Biermeret v. Univ. of Tex. Sys., No. 02-06-00240-CV, 2007
WL 2285482, at *5–6 (Tex. App.—Fort Worth Aug. 9, 2007, pet. denied) (mem. op.)
(concluding that a university was immune from the plaintiff’s premises
liability claim because the plaintiff was required to present evidence of the
university’s knowledge “not just that the tile floor in the shower area was
prone to become wet and slick, but that on the date in question it actually had
become wet and slick prior to [the plaintiff’s] fall”).

          Citing
Reyes and Stewart, among other cases, the City contends that the
“relevant dangerous condition is the floodwater” and that the City’s knowledge
that Skyline “could be subject to flooding . . . is not the relevant inquiry.” 
Appellees concede in their brief that under the rationale expressed in Reyes
and the other cases cited above, the City’s duty “to warn or make safe would
not arise until the [C]ity knows it is actually flooding.”  Appellees
acknowledge that under Reyes, “it is not the threat or possibility of a
flood that triggers a duty to warn or make the flooded area safe.  It is only
the actual flooding . . . that triggers the duty.”

          Appellees
have accurately stated the rule that the supreme court applied in each of the Reyes-like
cases.  That rule creates a problem for appellees because, as the City argues,
the only facts that appellees cite to in an effort to show that the City
breached a duty are matters that occurred before the night of the June 2007
flood.  Specifically, in the section of appellees’ summary judgment response in
which they detailed the duties that they believed the City breached, they
stated that the City had failed to eliminate the flooding danger prior to June
2007 and that the City had failed to warn them that they were living in a
floodway prior to June 2007.  Under the cases cited above, neither of these facts
can waive the City’s immunity under a premises defect theory because they
occurred when the City had knowledge of conditions in Skyline that could later
create a dangerous condition rather than occurring after the City had actual
knowledge of the relevant dangerous condition, which was the June 2007 flood.  Appellees
conceded in the trial court that they were not complaining about any conduct by
the City on the night of the flood.  They also stated in an interrogatory
response that they were not complaining about police officers, firemen, and
other emergency personnel who engaged in rescue efforts or responded to 911
calls.

          Appellees
do not contend that the City has misinterpreted the holding in Reyes;
rather, appellees contend that applying Reyes to the facts of this
appeal “simply makes no sense” because doing so would impose a more difficult
duty upon cities to respond to flooding itself rather than reducing the danger
of future flooding, and because when it is flooding, it is too late to take
simple measures like posting warning signs about homes being located within a
floodplain, which an entity has ample time to do when it is not flooding.  Thus,
appellees ask us to “impose” duties upon the City that are greater than the
duties required by Reyes and the other cases cited above.  But in the
section of their brief where they discuss Reyes, appellees have not
cited any cases, from the supreme court or otherwise, that distinguish the holdings
in Reyes-like cases while imposing a different rule.  Also, any consideration
of how much sense the supreme court’s precedent makes to us is immaterial to
our obligation to follow it.  See Lubbock Cnty., Tex. v. Trammel’s Lubbock
Bail Bonds, 80 S.W.3d 580, 585 (Tex. 2002) (“It is not the function of a
court of appeals to abrogate or modify established precedent.”); Grapevine
Excavation, Inc. v. Maryland Lloyds, 35 S.W.3d 1, 5 (Tex. 2000) (“Adhering
to precedent fosters efficiency, fairness, and legitimacy.”).

          We
determine that appellees did not present more than a scintilla of evidence
establishing an essential element of their premises defect claim:  that the
City failed to exercise ordinary care after receiving actual knowledge of the
relevant dangerous condition, which was the June 2007 flood.[12] 
See Reyes, 335 S.W.3d at 608–09; Stewart, 249 S.W.3d at 414–15; Corbin,
1 S.W.3d at 747. Thus, we hold that the trial court erred by denying the City’s
no-evidence motion for summary judgment with respect to that claim.  See
Tex. R. Civ. P. 166a(i); Hamilton, 249 S.W.3d at 426.  We sustain the
City’s second issue to that extent.

The
City’s Immunity from Appellees’ Claim under Wilson

          Appellees
argue that the “acts and omissions of Haltom City about which [they] complain
arose from the negligent implementation of policies” concerning warning the
public about Skyline’s flooding danger, buying out properties in Skyline that
were in danger of flooding, and taking other actions “before the June 18, 2007
flood hit Skyline.”  In other words, appellees argue that the City undertook a
responsibility to provide notice and protection to Skyline residents concerning
the potential for flooding there and that the City was negligent with respect
to completing that undertaking.  See Dukes, 252 S.W.3d at 598 (explaining
that a negligent undertaking theory rests on a plaintiff’s allegations that the
defendant undertook to perform services that it knew or should have known were
necessary for the plaintiff’s protection and that the defendant failed to
exercise reasonable care in performing those services).[13] 
Although the cases cited below indicate that the City’s immunity could be
waived by section 101.021 through a negligent undertaking theory under proper
facts, appellees did not present evidence that raises genuine issues of
material fact on essential elements of the theory.

          Appellees
argue that in Wilson,

the Texas Supreme Court held . . . that a government
entity that undertakes a duty to protect persons from the flooding of a river
may have liability if the river floods and causes death or injury . . . .  Haltom
City undertook such a duty in this case, utterly failed in that duty[,] and
bears legal responsibility for [what] happened to the Collins and Aurell families.

The
City sought summary judgment on the grounds that there was no evidence that the
City owed or breached a duty under Wilson.  The City argues that Wilson
does not apply to this case because, in part, in Wilson, there was
evidence that the plaintiffs relied on the defendant’s undertaking, while there
is no similar evidence of reliance here.

          In
Wilson, two brothers had drowned in a river.  8 S.W.3d at 635.  The
river was owned by the State of Texas, but the brothers’ beneficiaries sued the
Texas Parks and Wildlife Department (the Department), which owned a park that
adjoined the river.  Id.  There was no evidence that the Department
controlled the river, but there was evidence that

the Department had the authority to restrict visitors’
use of the river in certain areas, and that it had established a “flood early
warning system” in response to prior drowning deaths that had occurred on the
river.  The Department put up signs around the park notifying visitors that
they should leave the river area immediately whenever they heard the flood
warning sirens, and put similar warnings on maps and other park literature.  The
flood early warning system was not functioning properly on the day of the
accident and so the siren did not go off to warn the Wilsons that the river was
flooding.

          . . . .

          . . .  Plaintiffs allege that the Department
was negligent, not in preventing the river from flooding, but in failing to
provide visitors with adequate warning of the impending flood.  Plaintiffs
contend that by putting up signs about its flood warning systems, the
Department encouraged visitors’ reliance that the park rangers were monitoring
the river and would provide adequate warning if dangerous conditions developed.

Id. at
635–36 (emphasis added).  With that factual background, the supreme
court remanded the case to the trial court under the rationale that a party may
owe a “duty of due care if it undertakes to make the premises safe for others.” 
Id. at 635.  As authority for this proposition, in footnote four of its
opinion, the supreme court quoted section 323 of the Restatement (Second) of
Torts, which states,

          One who undertakes, gratuitously or for
consideration, to render services to another which he should recognize as
necessary for the protection of the other’s person or things, is subject to
liability to the other for physical harm resulting from his failure to exercise
reasonable care to perform his undertaking, if

          (a) his failure to exercise such care increases
the risk of such harm, or

          (b) the harm is suffered because of the other’s
reliance upon the undertaking.

Restatement
(Second) of Torts § 323 (1965); see Wilson, 8 S.W.3d at 635 n.4.  The
supreme court’s citation and application of this section in Wilson makes
sense because, as the court explained, the plaintiffs had contended that the
Department’s signs encouraged the brothers’ reliance on the Department to warn
them of danger.[14]  See Wilson, 8
S.W.3d at 635 n.4, 636.

          Along
with citing section 323 of the Restatement in footnote four of its opinion in Wilson,
the supreme court also cited three of its cases, including Colonial Sav.
Ass’n v. Taylor, 544 S.W.2d 116, 117 (Tex. 1976).  In Taylor, a
plaintiff had alleged that a mortgage company had gratuitously assumed
responsibility for insuring a house against fire by sending a letter stating
that the property was insured.  Id. at 119.  The court in that case quoted
section 323 to hold that although there was no evidence that the mortgage
company increased a risk of harm, there was a disputed fact issue about whether
the mortgage company had assumed responsibility to insure the house because
Taylor had relied on the company’s letter.  Id. at 119–20.  The other
two cases that the supreme court cited in footnote four of Wilson, for
support of its statement that a defendant may owe a duty of care if it
undertakes to make a premises safe for others, were Lefmark Mgmt. Co. v. Old,
946 S.W.2d 52, 54 (Tex. 1997) and City of Denton v. Page, 701 S.W.2d
831, 835 (Tex. 1986).  In both of those cases, to support statements that a
defendant may owe a duty to make premises safe, the supreme court cited a case
from the Beaumont court of civil appeals in which that court held that the
plaintiff’s reliance on a defendant’s promise to remove slippery algae created
a duty upon the defendant to do so.  See Old, 946 S.W.2d at 54 (citing Gundolf
v. Massman-Johnson, 473 S.W.2d 70, 71–75 (Tex. Civ. App.—Beaumont 1971), writ
ref’d n.r.e., 484 S.W.2d 555 (Tex. 1972)); Page, 701 S.W.2d at 835
(citing Gundolf).

          Many
cases concerning premises defects and other types of negligence support the supreme
court’s statement in Wilson (through the court’s quotation of section 323
of the Restatement) that for a duty to arise upon a defendant through a
voluntary undertaking, the defendant must have increased the plaintiff’s risk
of harm or the plaintiff must have relied on the defendant’s undertaking to
make the premises safe.  For example, in Torrington Co. v. Stutzman, a
case in which the plaintiffs relied on an undertaking theory to argue that the defendant
had a duty with respect to the plaintiffs’ negligence and products liability
claims, the supreme court examined the propriety of a jury charge that omitted
the increased-risk-of-harm or reliance requirements.  46 S.W.3d 829, 837 (Tex.
2000).[15]  In holding that the
jury charge was erroneous, the court, relying in part on section 323, stated,

The [broad-form negligence] question . . . allowed an
affirmative answer regardless of whether anyone relied upon Torrington’s
undertaking, or whether Torrington’s performance of its undertaking increased
the plaintiffs’ risk of harm.  Because the question allowed the jury to find
Torrington liable even if the plaintiffs did not establish the necessary
factual predicates for a negligent undertaking duty, it was erroneous.  These
essential elements of an undertaking claim should be included in the
instructions accompanying a broad-form negligence question.  Thus, the jury
should have been instructed that Torrington was negligent only if (1) Torrington
undertook to perform services that it knew or should have known were necessary
for the plaintiffs’ protection, (2) Torrington failed to exercise reasonable
care in performing those services, and either (3) the Navy relied upon
Torrington’s performance, or (4) Torrington’s performance increased the
plaintiffs’ risk of harm.

Id. at 838
(citations omitted).  In a footnote, the supreme court added, “We have never
held that a person may be liable on an undertaking theory without establishing
reliance or increased risk of harm, and we decline to do so now.”  Id.
at 838 n.7.

          More
than twenty years ago, the supreme court decided another case in which the
court, under the context of the TTCA, considered whether a defendant had
voluntarily undertaken a duty with regard to a plaintiff’s negligence claim.  See
Fort Bend Cnty. Drainage Dist. v. Sbrusch, 818 S.W.2d 392, 395–96 (Tex.
1991).  In Sbrusch, a drainage district obtained an easement across
privately-owned land to construct a drainage channel.  Id. at 393.  In
exchange for obtaining the easement, the district agreed to repair all damage
to roads and passageways resulting from the district’s use of the easement and from
the district’s traveling to and from the easement.  Id.  In March 1981,
someone informed the district that a bridge was unsafe, and one of the
district’s employees said that the district would “take care of it.”  Id.
at 394.  In December of that year, however, the bridge had not been repaired,
and as Sbrusch attempted to cross the bridge, it collapsed.  Id.  Sbrusch
sued the district and Fort Bend County, alleging negligence in failing to
repair the bridge and in failing to warn the public of its dangerous
condition.  Id.  Although a jury awarded damages to Sbrusch, the supreme
court concluded that the district did not have a duty to Sbrusch to repair the
bridge, stating in part,

A future obligation based on past conduct will arise if
the first undertaking has increased a risk of harm, thereby requiring
additional action to protect third persons, or if the actor makes an express
promise that future assistance will be forthcoming, and the injured party
relies to his detriment on that promise and the past conduct.  In the present
case, there is no evidence the District’s past repairs increased the
risk of harm to Sbrusch.  Furthermore, while certain statements were made . . .
indicating that future assistance would be forthcoming, there is no evidence
that Sbrusch knew of this “promise” . . . .  Without any knowledge that the
District had undertaken to perform further repairs on this bridge, Sbrusch was
not entitled to detrimentally rely on the District to perform the needed repair
based solely on its past conduct.

Id. at
394, 397–98.

          Like
the supreme court, courts of appeals, including our own court, have also noted
that for a duty to arise on a voluntary undertaking theory, the plaintiff must
prove an increased risk of harm or reliance.  See, e.g., Dukes,
252 S.W.3d at 597–99 (citing section 323 and Stutzman in a premises
liability case while explaining that the plaintiff had failed to show reliance
or an increased risk of harm to establish that a duty arose as a result of a
voluntary undertaking); Tex. Woman’s Univ. v. The Methodist Hosp., 221
S.W.3d 267, 284 (Tex. App.—Houston [1st Dist.] 2006, no pet.); Johnson v. Brown
Cnty., No. 11-00-00331-CV, 2001 WL 34373595, at *3 (Tex. App.—Eastland
Sept. 6, 2001, no pet.) (not designated for publication) (holding that a county
had no duty to mow tall grass and weeds that obscured a driver’s view to an
intersection under a voluntary undertaking theory because (1) the county’s
mowing the grass and weeds on prior occasions did not increase the plaintiff’s risk
of harm, and (2) the plaintiff did not show reliance).

          Appellees
argue that the City had a duty with respect to the premises at Skyline under Wilson
because, among other reasons,

·       
the
City was aware of many instances of prior flooding in Skyline;

 

·       
the
City sought to protect residents of Skyline from the flooding;

 

·       
the
City exercised control over the creeks and waterways within its city limits;
and

 

·       
the
City had the authority to restrict the placement of mobile homes in flood-prone
areas.

          The
summary judgment evidence establishes the following facts.  In 1987, the City
enacted an ordinance to prevent flood damage.  In 1990, the City issued a
memorandum stating that it had met with representatives of the Federal
Emergency Management Agency (FEMA) concerning the “Skyline Mobile Home Park
floodway issue.”  The memo noted that Skyline had “[p]rivate streets, water,
and sanitary sewer lines,” and it stated, in part, “FEMA is of the opinion that
it is the [City’s] responsibility to notify property owners that they are in a
floodplain . . . .”  The City also sent a letter to Skyline’s
residents in 1990 that stated in part,

          Recently, public attention has been drawn to
the location of a portion of the Skyline Park being located in the Whites
Branch Creek floodway.  We are writing to make you aware that your lot is
located in a floodway area as designated by [FEMA].

          . . . .

          . . .  A small portion of the mobile home park
(+50 lots) is located in what is called the “floodway” . . . .

          . . .  The mobile homes within the floodway of
Skyline . . . have flooded at least four times in the past – 1981, twice in
1988, and twice in 1989.

Also
in 1990, the City sent a letter to Skyline that asked Skyline to make existing
and future residents aware that they were living in a floodway; City Manager Tom
Muir testified in his deposition that he was not aware of any letters that the
City sent to Skyline residents after 1990 to notify them of the danger of
flooding.

          In
1991, Philip Patterson, the City’s floodplain administrator at that time, wrote
a letter to FEMA recognizing that Skyline had properties within the floodway
and floodplain but stating that those properties would be allowed to remain
there because they had been platted and sold prior to the completion of a flood
insurance rate map.  The letter stated, however, that the City intended to
“initiate a proactive public notification process in the park regarding the
floodway issue.”

          Years
before the June 2007 flood, the City amended chapter thirty-eight of its code
of ordinances.  The City expressed that some of the purposes of chapter
thirty-eight were to promote safety, protect human life and health, minimize
public and private losses caused by flood conditions, minimize the need for
rescue and relief efforts associated with flooding, and ensure that potential property
buyers would be notified that the property was in a flood area.  According to
Muir, FEMA requires local governments to adopt flood prevention requirements
for the governments’ residents to be eligible for flood insurance through a
national program.  Ice’s affidavit states that chapter thirty-eight was adopted
in accordance with the requirements for the national flood insurance program.

          Some
of the language in chapter thirty-eight had been contained in the 1987
ordinance.  A section of chapter thirty-eight, titled “Flood Mitigation Plan,”
recites,

          The city is impacted primarily by two streams
that traverse the city.  Big Fossil Creek generally runs along the eastern part
of the city, while Little Fossil Creek traverses the southwest corner of the
city.  Most significant flooding problems are associated with these streams and
their tributaries. . . .

          One of the most significant flooding problems
within the city involves flooding of mobile homes in [Skyline] . . . on [Whites]
Branch, a tributary of Big Fossil Creek in the northern part of the city.

Another
section stated,

          Significant flooding in the city occurs
primarily along the major streams, specifically in two locations.

          . . . .

          The second major area of flooding occurs along [Whites]
Branch, a tributary of Big Fossil Creek . . . in northern Haltom City.  A large
portion of [Skyline] is inundated by the 100-year rain event.  A number of
mobile homes are located within the floodplain, and several are situated in the
actual floodway. . . .  Flooding has been frequent enough in the mobile home
park that fire department personnel monitor the area when moderate to heavy
rainfall occurs.  On several occasions, rescues have been necessary to remove
residents from the mobile homes as floodwaters rise. . . .  These rescues have
been made in dump trucks, which are heavy enough to avoid being swept away, as
well as small boats.  In addition to endangering the citizens, the rescuers
themselves are also endangered by the high water.

Yet
another section stated,

          Because of the hazard in [Skyline] described
previously to property, citizens and emergency response personnel, and because
of the likelihood of recurring problems in this area, it is likely that the
most cost effective solution is for the city to purchase the lots subject to
flooding in order to completely eliminate the threat of flood damage.  Clearly,
the hazard to the residents of [Skyline], as well as to emergency response
personnel, renders a “no action” alternative unacceptable.

          As
part of the City’s desire to reduce the risks associated with flooding, the
City expressed within chapter thirty-eight that it would implement an “action
plan” that included developing a public education program to encourage citizens
to buy insurance and to notify them if they lived in a flood-prone area; applying
for a federal grant for the purchase of high-risk properties; and purchasing the
high-risk properties, including, potentially, “133 lots in the Skyline Mobile
Home Park . . . within the 100-year floodplain, of which 27
are in the regulatory floodway.”  Chapter thirty-eight also stated that no structure
could be “located, altered, or have its use changed without full compliance
with the terms of th[e] chapter”; that the city manager would be responsible
for implementing chapter thirty-eight’s provisions; that manufactured homes
were required to be elevated and anchored to resist flotation, collapse, and
lateral movement; and that manufactured homes could not be “placed in areas
which ha[d] been identified as regulatory floodways.”

          In
April 2002, FEMA approved the City’s flood mitigation plan and stated that the
City was eligible to apply for grants.  But in more than five years between
then and June 2007, the City did not apply for such grants.

          Chief
Rhodes said that he had limited knowledge of the flood mitigation plan, had not
studied it, and was not involved in implementing it.  During his deposition,
Chief Rhodes did not know who the City’s floodplain administrator was, and he
said that prior to the June 2007 Skyline flood, he had never interacted with
Muir about flooding issues in Skyline.

          During
Muir’s deposition, he expressed that he did not know who the City’s floodplain
administrator was or what a floodplain administrator did.  He also testified
that he was “not real familiar” with the City’s flood mitigation plan because
he had not read it and that he did not know who should have administered the
plan.  From 2002 until June 2007, Muir did not have meetings with anyone in the
City’s public works department concerning flood mitigation issues.  Muir
recognized, however, that as the city manager, he was responsible to see that
the City’s ordinances were carried out, and he was therefore responsible to
assign someone to implement the flood mitigation plan.  Muir testified in his
deposition that he first learned about the possibility of the City’s purchasing
lots in Skyline after the June 2007 flood.

          David
Fain, the City’s director of public works, oversees the City’s floodplain
administrator, but like Muir, during Fain’s deposition, he was unfamiliar with
the flood mitigation plan.  Before June 2007, Fain had never been asked to
address the flooding issue in Skyline.

          The
City enacted a storm water fee in 2004 and therefore started adding a charge to
residents’ monthly water bills.  In each of the 2004/2005, 2005/2006, and
2006/2007 fiscal years, the fee generated more than $1 million in revenue.  Although
the fee had been mentioned in chapter thirty-eight as a source of funding for
taking the actions described in the plan, including acquiring flood-prone
properties, the City did not use any of the money for buying out Skyline’s
properties; rather, the City spent the money to clean creeks, hire personnel to
maintain the City’s drainage infrastructure, and purchase equipment for
drainage maintenance.

          In
his deposition, Perry Bynum said that as the City’s emergency management
coordinator, he is responsible for seeking and managing grants.  Bynum
testified in his deposition, however, that he had never read the flood
mitigation action plan.  He also said that he did not know that the drainage
utility fee could be used for flood mitigation.  Although Bynum knew before
June 2007 of the possibility that mobile homes in Skyline could be bought out,
the City did not buy out any mobile homes before that time.[16]

          In
his affidavit, Muir said that although the City had recognized in chapter
thirty-eight that it could purchase flood-prone properties, he was not aware of
a legal requirement that would have compelled the City to do so.  Muir also
said that he was not aware of any law that mandated any specific actions for
flood mitigation, including educating residents, making structural improvements,
or monitoring flooding.  Chief Rhodes and Bynum said the same thing in their
affidavits.  Bynum explained, “[T]here are no specific requirements or laws or
ordinances as to the schedule for when purchases of Skyline properties would be
carried out . . . .”  He also noted that chapter
thirty-eight, which expressed the City’s concerns about flooding in Skyline,
was a public record that could have been accessed by the City’s residents. 
Finally, he explained, “Prior to the flood . . . in Skyline . . . ,
Haltom City . . . had not made any specific commitment to
take any specific steps to protect the residents of Skyline from flood
events.”  Concerning the City’s flood mitigation plan, Fain said, “[A] plan is
exactly that, it’s . . . a guide to assist in making
decisions.  It doesn’t mean it’s . . . a plan that has to
be implemented, unless it’s directed by our decision maker to say you will administer
this plan verbatim.”

          Months
before the June 2007 flood, in the course of preparing a hazard mitigation
action plan, Bynum created a document that stated in part,

          The probability for flooding to occur within
Haltom City is high due to the various [floodplains] that run through our city. 
Flash flooding can and does occur regularly when there is a rain cell that is
either over our city or even [upstream] from our city.  The creeks that run
through Haltom City can easily be overwhelmed from as little as two to three
inches of rain falling over a short period of time.

          . . . .

          Residential housing in Haltom City has been
exposed to flooding and [its] after effects.  The homes that are in and around
the floodplain are obviously at risk, but the majority of the time those
individuals have little or no way to flood proof their home.

          . . . .

          Haltom City would propose to buy out and move
over 200 manufactured homes to reduce the exposure to annual flooding of this
manufactured home community.

          . . . .

          The benefit [of buying out the manufactured
homes] would be [immense] in numerous ways from reducing the possibility of
loss of life to not only the owner of the property but also to the first
responder who is risking life and limb to save the flood victim. . . . 
I think we have seen the effects of not moving fast enough to mitigate a
hazard before there is a loss of life.

          This
evidence, along with the remaining summary judgment evidence presented by
appellees, might raise a genuine issue of material fact on two elements
of a negligent undertaking claim under Wilson:  that the City undertook a
duty to perform services that it knew or should have known were necessary for appellees’
protection and that the City failed to exercise reasonable care in performing
those services.  See Wilson, 8 S.W.3d at 635 n.4; Dukes, 252
S.W.3d at 598.  The facts, however, do not comprise any evidence of the other
“essential elements” of a negligent undertaking claim:  that appellees relied
on the City’s undertaking or that the City’s undertaking increased appellees’
risk of harm.  See Dukes, 252 S.W.3d at 603 (holding that the
plaintiff’s attempt to impose a duty through a voluntary undertaking theory “necessarily”
failed because the plaintiff did not present evidence creating a genuine issue
of material fact on reliance or increased harm); see also Stutzman, 46
S.W.3d at 838 (referring to reliance or increased risk of harm as “essential
elements” of an undertaking claim); Guadalupe-Blanco River Auth. v. Pitonyak,
84 S.W.3d 326, 342 (Tex. App.—Corpus Christi 2002, no pet.) (explaining that an
entity’s negligent implementation of a policy does not itself waive immunity
and that a plaintiff must still establish a waiver of immunity under 101.021).

          Appellees’
summary judgment evidence negates the possibility that they relied on the City
to address Skyline’s flooding issue; rather, it demonstrates that they did not even
know of a potential for flooding.  In his affidavit, Aaron Collins said,

When the June 18, 2007 flood hit, my wife and I did not
know and were not told by anyone that the mobile home we leased was located in
a floodway, a floodplain[,] or in a dangerous [flood prone] area.  We did not
learn that information until after the . . . flood.  On June 18, 2007, we did
not know and were not told by anyone that that prior to the time we moved into
Skyline, there had been numerous significant floods in the area of the park
where we lived, and that during several of these past floods, Skyline residents
had to be rescued from floodwaters by emergency personnel.

Natasha
Collins, Jacki Chantell Sexton-Aurell, and Brian Aurell made similar
statements.  Appellees state in their brief that they were “unaware that the
mobile homes they leased were sitting in a floodway” because “they had never
been so warned by Haltom City or anyone else.”

          Also,
appellees did not present evidence of an increased risk of harm caused by the
City’s undertaking.  While the summary judgment evidence may raise a genuine
issue of material fact on whether the City failed to exercise reasonable care to
lessen the known danger in Skyline, the evidence does not raise a fact issue that
the danger of flooding at Skyline generally, or the danger to appellees
specifically, was worse because of the City’s actions than if the City had never
recognized the danger and had never expressed an intention to remedy it.  The
evidence does not establish, for example, that someone else would have warned
appellees about Skyline’s flooding danger or would have abated that danger but
for the City’s undertaking to do so.

          For
these reasons, based on the undisputed facts recited above, we conclude that
appellees failed to present evidence that creates a genuine issue of material
fact on essential elements of their negligent undertaking claim, under Wilson,
against the City, and that the trial court erred by denying the City’s no-evidence
motion for summary judgment with respect to that claim.  See Tex. R.
Civ. P. 166a(i); Hamilton, 249 S.W.3d at 426; Stutzman, 46 S.W.3d
at 838; Wilson, 8 S.W.3d at 635 n.4, 636.  We therefore also sustain that
part of the City’s second issue.[17]

Conclusion

          Having
sustained the City’s second issue, we reverse the trial court’s order denying
the City’s motion for summary judgment, and we render a judgment dismissing
appellees’ suit against the City with prejudice.

 

 

 

TERRIE LIVINGSTON
CHIEF JUSTICE

 

PANEL: 
LIVINGSTON,
C.J.; DAUPHINOT and GABRIEL, JJ.

 

DAUPHINOT,
J., filed a dissenting opinion.

 

DELIVERED:  August 23, 2012












 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

 

NO. 02-11-00197-CV

 

 


 
 
 City of Haltom City
 
 
  
 
 
 APPELLANT
 
 
 
 
  
 V.
  
 
 
 
 
 Brian Aurell, Individually and as Next Friend of
 Ranger Hunter Aurell, A Minor; Jacki Chantell Sexton-Aurell, Individually;
 Aaron Collins, Individually and as Representative of the Estate of
 Alexanderia Collins; and Natasha Collins, Individually AND AS REPRESENTATIVE
 OF THE ESTATE OF ALEXANDERIA COLLINS AND AS NEXT FRIEND OF CHESLEA MCMASTER
 
 
  
 
 
 APPELLEES
 
 


 

 

----------

FROM THE 48th
District Court OF Tarrant COUNTY

----------

DISSENTING
OPINION

----------

Appellant
City of Haltom City argued below only that there was no waiver of sovereign
immunity.  Because I believe the summary judgment evidence supports the trial
court’s decision and that justice would be best served in this case by allowing
Appellees a trial on the merits, I respectfully dissent from the majority
opinion reversing the sound decision of the trial court.

 

 

 

 

LEE ANN DAUPHINOT
JUSTICE

 

DELIVERED:  August 23, 2012

 









[1]See
Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(8) (West Supp. 2012).





[2]Whites Branch Creek enters
the City at its northeast corner, which is about half of a mile north of
Skyline, and the creek flows south.





[3]The record indicates that
runoff from other cities flowed into Haltom City and caused the creek’s water
level to rise.





[4]Natasha concedes that the
emergency responders did all that they could to find Alexanderia.





[5]According to City Engineer
Tom Ice, who also serves as the City’s floodplain administrator, a floodway is
a channel on a water course “that must be reserved in order to discharge a base
flood without cumulatively increasing the water surface elevation more than [a]
designated height.”  A floodplain is “land susceptible to being inundated by
water.”  Chief Rhodes described the floodway as “creek level.”  A City
ordinance describes a floodway as an “extremely hazardous area due to the
velocity of flood waters.”





[6]The City owned a buried,
underground sewer line that ran through part of Skyline, but the sewer line did
not affect the flow of surface water in Skyline.  The City also owned a part of
the creek that was approximately half a mile downstream from Skyline.





[7]Appellees eventually
settled their claims against Skyline.





[8]See Tex. Civ. Prac.
& Rem. Code Ann. §§ 101.021–.022 (West 2011).





[9]8 S.W.3d 634, 635–36 (Tex.
1999).





[10]The City filed a motion
for summary judgment rather than a plea to the jurisdiction.  That distinction
does not affect our jurisdiction over the City’s interlocutory appeal.  See
Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(8); Tex. Dep’t of
Criminal Justice v. Simons, 140 S.W.3d 338, 349 (Tex. 2004) (“[A]n
interlocutory appeal may be taken from a refusal to dismiss for want of
jurisdiction whether the jurisdictional argument is presented by plea to the
jurisdiction or some other vehicle, such as a motion for summary judgment.”).





[11]See Tex. Civ.
Prac. & Rem. Code Ann. § 101.101 (West 2011).





[12]We recognize that the Reyes-like
holdings make it difficult to satisfy the elements of a premises liability
claim in cases with facts similar to those in this case.  Nonetheless, we are
obligated to follow the precedent of our supreme court.  See Smith v.
Kelly-Moore Paint Co., Inc., 307 S.W.3d 829, 834 (Tex. App.—Fort Worth
2010, no pet.).





[13]Appellees did not
expressly raise a “negligent undertaking” claim in their pleading, but they pled
that the City was negligent under Wilson separately from being negligent
under a premises defect theory.  The issue of the application of Wilson,
which concerns negligent undertaking principles, was litigated in the trial
court through the City’s summary judgment motion and through appellees’
response, in which appellees stated that their claim under Wilson was in
“addition to their traditional premises liability claim.”  We will therefore
analyze whether negligent undertaking principles could have imposed a duty on
the City beyond the duty that typically arises in premises liability claims.





[14]The City argues that Wilson
is distinguishable from this case because unlike the Department in Wilson,
the City “never installed or required the type of warning signs which were
central to the possibility that a duty was assumed.”





[15]The supreme court has
equated the undertaking theory presented in Stutzman with the one
discussed in Wilson.  See id. at 841; City of Waco v. Kirwan,
298 S.W.3d 618, 627 (Tex. 2009) (citing Stutzman and Wilson
together while discussing negligent undertaking claims).





[16]After the June 2007
flood, the City obtained $1.47 million from FEMA.  In 2009, with the FEMA grant
and its own money, the City began purchasing dozens of properties.  The City was
able to remove several homes in Skyline from the floodway; as of February 22,
2011, the City had entered contracts on sixty lots and had closed transactions
on forty-six lots.  Muir said in his deposition that the City could have
purchased the lots without the FEMA grant.





[17]Because our decision to
sustain the City’s second issue is dispositive, we decline to address the
City’s other four issues, in which they contend that the trial court should
have also granted summary judgment for other reasons.  See Tex. R. App.
P. 47.1; Binzer v. Alvey, 359 S.W.3d 364, 367 (Tex. App.—Fort Worth
2012, pet. denied).